MYRICK, APPELLANT, v. PEET, RESPONDENT.

(No. 4,182.)

(Submitted March 17, 1919. Decided April 17, 1919.)

[180 Pac. 574.]

*Ejectment—Boundaries—Monuments—Courses and Distances—*
*Burden of Proof—Agreement to Fix Line—Statute of Frauds.*

Boundaries—Lost Monuments—Courses and Distances.

    1. In a boundary line dispute, all means for ascertaining the location of alleged lost monuments must first be exhausted, before recourse may be had to courses and distances.

    [As to procedure in boundary suits, see note in 22 Am. St. Rep. 36.]

Same—Monuments—When Controlling.

    2. In case of conflict between monuments and courses and distances, the latter must yield to the former.

Same.

    3. Monuments which can be recognized by competent civil engineers must be taken as the guide in fixing boundaries.

Constitutional Law—Judiciary—Function.

    4. The function of the judiciary is to give effect to the legal acts of the legislative and executive departments of government, not to supervise them.

Boundaries—Decree—Review—Presumption of Correctness.

    5. Before a judgment based upon a directed verdict in a boundary dispute, in which the deeds were not in evidence, and where, aside from testimony placing the official monuments, no means were at hand for fixing the dividing line, may be disturbed, it must be made to appear that the court arbitrarily determined some fact properly a matter for determination by jury; else the presumption of correctness attaches.

Same—Agreement Fixing Line—Burden of Proof.

    6. Where an agreement between adjoining land owners fixing the location of a boundary line is relied upon in an action in ejectment, the burden of showing its existence, as well as that the boundary was one between contiguous lots, was doubtful and uncertain, and had been accepted and acquiesced in, is upon the party alleging its existence.

Same—Agreement Fixing Line—Statute of Frauds.

    7. In the absence of a real dispute, an agreement, purporting to establish the boundary between lands of adjacent proprietors at a line known by both to be incorrect, the result of which, if given effect, must be to transfer to one lands which both know do not belong to him, is without consideration, and within the statute of frauds and void.

Same—Agreement Fixing Erroneous Line—Ascertaining of True Line—Effect.

    8. Where lands of two adjoining proprietors are divided by a fence which they suppose to be the true line, they are not bound by the supposed line, but must conform to the true one when ascertained.

*Appeal from District Court, Chouteau County; John W. Tattan, Judge.*

Action by Hobart D. Myrick against D. C. Peet. Judgment for defendant, and plaintiff appeals from it and an order denying him a new trial. Affirmed.

*Messrs. Cooper, Stephenson & Hoover,* for Appellant, submitted a brief; *Mr. Hoover* argued the cause orally.

We take the position that the monuments which defendant contends are government monuments are a part of a survey of this township which has been and is wholly unofficial, void and of no effect, and that by reason of their inclusion in such a survey the particular monuments in dispute are unofficial. Whether a given monument can or ought to be given an official character depends largely upon its associates and upon the associations connected therewith, and upon its relation to the official plat and the field-notes of the survey. The plat and field-notes constitute the evidence of what the surveyor himself said on the subject. If they are inconsistent with the monument, then the monument ought not to be treated as such in the survey, unless there is some evidence of a convincing nature to give it character and standing as a monument. While it is true that courses and distances usually give way to monuments, this is only true where the monument is clearly established as such by other evidence associated with it.

In the course of the opinion in the case of *Robinson* v. *Laurer,* 27 Or. 315, 40 Pac. 1012, the court says: "The rule that monuments shall control courses and distances is recognized only where the monuments are clearly ascertained. If there be doubt as to the monuments as well as to the course and distance, there can be no reason for saying that the monuments shall prevail rather than the course given in the patent, and that is this case." (*Thallman* v. *Thomas,* 102 Fed. 935, 936; *Duncan* v. *Eagle Rock Gold Min. etc. Co.,* 48 Colo. 569, 139 Am. St. Rep. 288, 111 Pac. 588, 592; *Woodbury* v. *Venia,* 114

Mich. 251, 72 N. W. 189, 192; *Cadeau* v. *Elliott*, 7 Wash. 205, 34 Pac. 916; *Greed* v. *Squire*, 9 Wash. 359, 37 Pac. 545, 547; *Knoll* v. *Randolph*, 3 Neb. (Unof.) 599, 92 N. W. 195.)

It is an equally well-recognized rule that no monument can be used which does not correspond with the description of the monument which is given in the field-notes. It is a rule of reason, and equally one of law, that in applying a description in a patent or deed to the land to which it refers, monuments will control courses and distances only where the monuments correspond to the description of them given in the instrument. (*Resurrection Gold Min. Co.* v. *Fortune Gold Min. Co.*, 129 Fed. 668, 64 C. C. A. 180.)

It has frequently been held that lines and monuments found on the ground but not corresponding to the description thereof in the patent do not control courses and distances. (*Pollard* v. *Shively*, 5 Colo. 309; *Bruckner's Lessee* v. *Lawrence*, 1 Doug. (Mich.) 19; *McCoy's Lessee* v. *Galloway*, 3 Ohio 282, 17 Am. Dec. 591, 594; *Claremont* v. *Carlton*, 2 N. H. 369, 9 Am. Dec. 8, 91.)

*Messrs. Norris & Hurd,* for Respondent, submitted a brief; *Mr. Edwin S. Norris* argued the cause orally.

When there is a conflict between the government monuments as established on the ground and the government maps and field-notes of a government survey, the monuments control the location and boundaries of surveyed lands of the government. (9 C. J. 210, secs. 118, 120; *Schmidtke* v. *Keller*, 44 Or. 23, 73 Pac. 332, 74 Pac. 222; *Bullion Beck etc. Min. Co.* v. *Eureka Hill Min. Co.*, 36 Utah, 329, 103 Pac. 881; *Hale* v. *Ball*, 70 Wash. 435, 126 Pac. 942; *Burke* v. *McCowen*, 115 Cal. 481, 47 Pac. 367; *Whiting* v. *Gardiner*, 80 Cal. 78, 22 Pac. 71; *Andrews* v. *Wheeler*, 10 Cal. App. 614, 103 Pac. 144; *Hanson* v. *Rice*, 88 Minn. 273, 92 N. W. 982; *Platt* v. *Vermillion*, 99 Fed. 356, 39 C. C. A. 555; *Rowell* v. *Clark*, 119 Iowa, 299, 93 N. W. 280; *Newsom* v. *Pryor*, 7 Wheat. (U. S.) 7, 5 L. Ed. 382.)

It is a principle of law established by the great weight of authority that where division lines between lands of adjacent owners may . be ascertained with certainty, no agreement between them establishing a division line is valid or binding upon either party.    This principle is well stated in the leading case upon the subject: *Hartung* v. *Witte,* 59 Wis. 285, 18 N. W. 175; see, also, Am. & Eng. Ency. of Law, 2d ed., 862; *Davenport* v. *Turpin,* 43 Cal. 597; *Smith* v. *Robarts,* 2 Cal. Unrep. 604, 9 Pac. 104; *People* v. *Kennedy,* 22 Cal. App. 29, 133 Pac. 25; *Clapp* v. *Churchill,* 164 Cal. 741, 130 Pac. 1061; *Pickett* v. *Nelson,* 79 Wis. 9, 47 N. W. 936; *Purtle* v. *Bell,* 225 Ill. 523, 80 N. E. 350; *Vosburgh* v. *Teator,* 32 N. Y. 561.    There must also be a dispute as to the location thereof, and otherwise an oral agreement locating such boundary lines is within the statute of frauds and not enforceable.    (*Hartung* v. *Witte, supra; Voigt* v. *Hunt* (Tex. Civ.), 167 S. W. 745; *Sheldon* v. *Michigan C. R. Co.,* 161 Mich. 503, 126 N. W. 1056; *Lennox* v. *Hendricks,* 11 Or. 33, 4 Pac. 515.)

If the appellant knew the true location of the boundary line in question as established by a government survey and withheld that fact from the respondent, then his act in establishing the line was sufficiently fraudulent to estop him from claiming any other than the true boundary line.    (5 Cyc. 934; *Denton* v. *English* (Tex. Civ.), 157 S. W. 264; *Francois* v. *Maloney,* 56 Ill. 399; *Boone* v. *Graham,* 215 Ill. 511, 74 N. E. 559; *Turner* v. *Angus,* 145 Mich. 679, 108 N. W. 1100, 1101.)

In *Kimms* v. *Libby,* 87 Neb. 113, 126 N. W. 869, the following language is found: "Where the true line can be ascertained and parties by mistake agree upon an erroneous line as their boundary, believing it to be the true line, they will not be concluded by such agreement from claiming to the true line when discovered, unless the statute of limitations has run or equitable reasons exist for establishing an erroneous line."    (See, also, *Foard* v. *McAnnelly,* 215 Mo. 371, 114 S. W. 990; *Jordan* v. *Ferree,* 101 Iowa, 440, 70 N. W. 611; *Heinz* v. *Cramer,* 84 Iowa, 497, 51 N. W. 173; *Coon* v. *Smith,* 29 N. Y. 392; *Davis* v. *Russell,*

142 Pa. 426, 21 Atl. 870; *Cheeney* v. *Nebraska & C. Stone Co.,* 41 Fed. 740; 9 C. J. 241, sec. 189.)

To take parol agreements of the character of the above out of the statute of frauds, it must appear that there was a doubt or uncertainty as to the true location of the dividing line, that there was a genuine dispute between the adjoining owners, that there was an acquiescence and possession under the agreement, and that the making of expenditures followed the agreement, and otherwise verbal agreements relative to boundary lines are within the statute of frauds. Tested by this rule the agreement between the appellant and respondent is within the statute of frauds, and may not be sustained. (*Vosburgh* v. *Teator,* 32 N. Y. 561; *Grants Pass. Land & W. Co.* v. *Brown,* 168 Cal. 456, 143 Pac. 754; 9 C. J. 232–235.)

MR. JUSTICE COOPER delivered the opinion of the court.

This is an action in ejectment. Plaintiff became the equitable owner of the northwest quarter, and the defendant the equitable owner of the northeast quarter, of section 25, township 21 north of range 12 east, by purchase at a sale by the state of lands acquired by it from the Federal government in said township and range, consisting of sections 24, 25, 26, 34, 35, and the southeast quarter of section 23. By the mutual agreement of the parties the officer in charge of the sale issued certificates to plaintiff and defendant, conveying to them, respectively, the northwest quarter and the northeast quarter of section 25 in said township and range. From the date of the sale to the spring of 1913 they occupied the two quarters conjointly for grazing purposes. In the spring of 1913, each party being desirous of cultivating the land so obtained, an effort was made to divide up the half section.

In his complaint, the plaintiff alleges, among other things: "That they were unable to discover any monuments, descriptive marks, or natural objects upon the ground" marking the boundaries of the section, and that, "in so far as the monuments or distinguishing marks upon the ground were concerned, the

56 Mont.—2

boundary line between the two tracts above described was doubtful and uncertain. That in order to settle and fix the dividing line between their said premises, *and to avoid the possibility of a dispute* (italics ours), plaintiff and defendant together, by measurements from monuments established by the official survey of said township by the United States government, located and determined the dividing line between said tracts, which plaintiff alleges to be approximately the true dividing line according to the official plat of the survey of said lands returned to the General Land Office by the surveyor-general. That they thereupon orally agreed that the line so fixed and established by them should constitute the dividing line between their respective premises.'' It is conceded that defendant built a fence twelve feet from the line so marked, cultivated the land up to the fence, and that the same was maintained in that position down to June 17, 1916, at which time the defendant moved the fence sixty-five rods to the west, excluded plaintiff therefrom, and has since cultivated and cropped the same.

The defendant by his answer puts in issue the allegations of the complaint as to any uncertainty or doubt concerning the location of the government survey monuments upon the ground, and alleges that the section and quarter-section corners could all be located without difficulty.

The foregoing summary of the pleadings and admissions comprises a complete statement of the material facts in the case, and is sufficient to dispose of all the issues of law and fact in dispute.

At the close of all the testimony, the court, on defendant's motion, directed a verdict in his favor, the essence of which is contained in the third paragraph thereof, as follows: ''That there is in this case no material conflict in the evidence as to any material issue framed by the pleadings, and, on account thereof, the questions presented have become wholly questions of law, and there is no fact upon which the jury may return a verdict.'' The court below took the respondent's view of the evidence, sustained the motion, denied the plaintiff's motion for a new trial, and

the case is now here on appeal from the order so made, and from the judgment entered upon the directed verdict.

The appellant contends: (1) That with the aid of the courses and distances indicated in the field-notes, it can be demonstrated that the fence line established by himself and defendant fixed the true boundary between the two quarter-sections in question; and (2) that under the parol agreement entered into between himself and the defendant the practical line dividing said two quarter-sections was permanently fixed, and is binding upon the defendant.

The respondent contends that the monuments were in the places allotted them by the surveyor making the original survey, were visible, and from them the true dividing line could be readily ascertained.

That the subject of disputed boundaries has been a fruitful [1] source of litigation since property rights were first recognized finds proof in the prodigious mass of literature to be found in the books upon the subject. The difficulty is not to find authority, but to select cases which best express the rule to be applied to the facts in issue. Innumerable cases involving boundary lines can be traced to loose description, faulty surveys, and excessive areas created in marking off governmental subdivisions—the bane of all tribunals called upon to reconcile discrepancies in the surveys of the public lands. The building of the fence was not to settle a dispute, but to acquiesce in the running of a line about which no dispute had arisen. There is a distinction between a mutual undertaking to settle and adjust a doubtful or disputed boundary line in case of conflicting titles, and the consent of parties to the marking of a supposed dividing line between adjoining tracts.

"The public lands of the western territories, which became the property of the United States government upon the formation of the present Union, were by Acts of Congress surveyed and divided up into townships, sections and subdivisions of sections. When afterward lands were sold to private individuals, they were always described by referring to the number of the

township, section, and subdivision of the section. The boundaries of these sections and of the quarter and half sections were marked for the most part by artificial monuments, which constituted the corners of these tracts of land. * * * Before courses and distances can determine the boundary, *all means for ascertaining the location of the lost monuments must first be exhausted.*" (Tiedeman on Real Property, sec. 832.)

"*Prima facie,* a fixed visible monument can never be rejected as false or mistaken in favor of mere course and distance as the starting point, when there is nothing else in the terms of the grant to control and override the fixed and visible call. The general rule that courses and distances must yield to natural or artificial monuments rests upon the legal presumption that all grants and conveyances are made with reference to an actual view of the premises by the parties." (Tyler on Ejectment, 569; *Garrard* v. *Silver Peak Mines* (C. C.), 82 Fed. 585, and cases there cited.)

"Monuments are facts; the field-notes and plats indicating courses, distances and quantities are but descriptions which serve to assist in ascertaining those facts." (*Martin* v. *Carlin*, 19 Wis. 454, 88 Am. Dec. 696.) When there is a conflict between monuments and courses and distances, the latter must yield to the former. (Devlin on Real Estate, sec. 1029; Rev. Codes, sec 8039, subd. 2.)

"Marks on the ground constitute the survey; courses and distances are only evidence of the survey." (9 C. J., sec. 210; *Hunt* v. *Barker*, 27 Cal. App. 776, 151 Pac. 165; *Woods* v. *Johnson*, 264 Mo. 289, 174 S. W. 375.)

The uncontroverted evidence regarding the monuments is substantially this: That but one survey was made of township 21 appears by the certificate of the surveyor-general, found in Exhibit "B." The witness Culbertson, testifying for plaintiff, stated: "Q. When the resurvey came it was established just exactly where we find the monuments marked 4, 7 and 11 on Exhibit 'A' for plaintiff, in reference to section 25? A. They found corners already established. * * * Q. Yet there is

nothing to show at all that the monuments 6, 10, 3 and 5½ have ever been changed in location, is there? A. No, sir. * * * Q. You agree that 6 and 10 are permanently located, do you not, at points intended for section corners? A. They are permanently located. Q. You agree that 7, 11 and 4 are permanently located? A. Yes. * * * Q. We agree, do we, that there is nothing in the field-notes that these monuments over here on the red west boundary line of 25, now designated as 5½ were ever changed? Nothing to show that, is there? A. Those points are still there.'' This establishes the four corners of section 25, the northwest corner being at point 5½, the southwest corner at point 3, the southeast corner at point 4, and the northeast corner at point 11. Point 6 is the north quarter corner, and point 10 is the south quarter corner of the section. There being no dispute concerning the north and south boundary lines of section 25, by running a straight line from point 6 to point 10, we have the dividing line of the section in question determined by Culbertson, the plaintiff's witness.

The witness Merrifield, summoned by the plaintiff, it appears, is a civil engineer of established reputation, familiar with the locality, having made a survey of the section in question years before. In his testimony he definitely establishes the northeast corner of the section at point 7 on plaintiff's Exhibit ''A,'' the southeast corner at point 4, the southwest corner at point 3, and the northwest corner at point 5½, the east quarter corner at point 11, the south quarter corner at point 10, and the north quarter corner at point 6. Concerning point 3 on the red line, he says the southwest corner is properly located there, having discovered that corner mark many years ago. He states that he has frequently seen it since. The witness Lindsay, testifying for defendant, corroborates Merrifield, and states that the southwest corner is marked by four pits, the point indicated by plaintiff's witness Culbertson at point 3.

With ocular and tangible proof of authentic boundaries at hand, it would be illogical to resort to courses and distances; for when physical marks, established and stamped by a govern-

ment officer, are visible, fixed, and capable of positive identifica-
tion, there are no lost monuments—they import absolute verity
and must prevail. Indeed, parties are bound by their locations
as they appear upon the ground, regardless of quantity men-
tioned in the deed. The question is not whether the monuments
were correctly placed, but whether they were placed by author-
ity. It was held by the supreme court of Washington (*Greer*
v. *Squire,* 9 Wash. 359, 37 Pac. 545), in a somewhat similar case,
that the true corner of a government quarter-section of land is
where the United States government surveyor established it,
notwithstanding its location may not be such as is designated in
the plat or field-notes. On this point there is neither conflict nor
clash of opinion. The law, therefore, is that where monuments
[3] can be recognized by competent civil engineers, they are to
be taken as the guide in fixing boundaries. As said by the
supreme court of the United States in *Cragin* v. *Powell,* 128
U. S. 691, 32 L. Ed. 566, 9 Sup. Ct. 203: "The power to make
and correct surveys of the public lands belongs to the political
department of the government." The function of the judiciary
[4] is to give effect to the legal acts of the other two depart-
ments of government, not to supervise them.

Appellant, in his brief on page 13, says: "While it is true
that courses and distances usually give way to monuments, *this
is only true where the monument is clearly established as such
by other evidence associated with it.*" The court below, short
of being actually upon the ground, following step by step the
[5] witnesses in examining the monuments which the survey-
ors testified bore the official stamp of identification, was in a
peculiarly advantageous position to get the psychological effect
of the testimony given by the witnesses. They were all fresh
from the *locus in quo,* and gave the court first impressions by
pointing out upon the maps the objects by which the definite
location of the monuments could be determined. Before the
judgment of the court below reached by such means, and pre-
sumptively correct, can be impeached, it must be made clearly
to appear that some fact properly for the consideration of the

jury was arbitrarily determined by the court, and so the province of the jury in that regard invaded. This is so obviously good common sense that the many cases in which this court has so expressed itself need not be adverted to. Two of the three surveyors testifying in the case were witnesses for appellant, and the identification of the markings on the monuments by all three of them is so nearly in harmony that the ruling of the court below must be accorded the usual presumption of correctness upon that point.

In this condition of the pleadings and the proof, it was incumbent upon the plaintiff to make out a *prima facie* case in such degree that men of ordinary minds might not well differ, to substantiate these propositions: (1) That there was a real dispute concerning the boundary line between the two quarter-sections, by reason of doubt or ignorance as to the true dividing line; and (2) that by reason thereof a valid agreement was consummated between himself and defendant, fixing definitely the line claimed by him as the true dividing line between the two quarter-sections involved.

Throughout this discussion it must be borne in mind that unless the evidence is clear and satisfactory and of such a character that the court would be required to hold it sufficient against a motion for a new trial, the issues must be decided against the plaintiff.

By their muniments of title, the plaintiff acquired the northwest quarter and the defendant the northeast quarter of section 25. The deeds are not in evidence, and aside from the testimony placing the official monuments, we have no means of fixing the [6] dividing line. We come now to the feature of the case involving the sufficiency and validity of what the plaintiff terms the agreement fixing the boundary line.

The plaintiff himself testified that: Defendant told him that he desired to cultivate the northwest quarter of section 25, and "we arranged to go out and locate the boundary. He came to my house one morning, and we took a fifty-foot tape measure and went to a temporary monument that Mr. Culbertson had erected.

We started from a certain monument,—not a government monument—and measured across the section, and then we started at the northwest corner of the section and measured half a mile east and set a stake and sighted by that. We did not check the north end from the range line. At the time we went to dinner we had an understanding that it was practically right. We were both willing to let it go at that. I don't recall anything else except we set the stakes. We wanted to establish the line there, and Culbertson's corners were in there, set in there when he established the road running north and south, and we went in there and set the dividing line between us, for we wanted to erect a fence. It was our understanding that we had fixed the line. The fence was erected something like twelve feet west of the line we established in between the two stakes. He had the northeast quarter of the section broken under contract by a tractor, and they plowed a little bit over the line through some misunderstanding, and we set a corner post where the south stake was. He asked me if it would be all right if he would move over to the west enough to get off the plowing, saying he wanted to avoid a weed patch under the fence. I told him I would rather he would do that than have a weed patch; but the understanding at the time was clear that the line was where the stakes and posts were set. This fence was erected late in the summer or fall of 1913. At the time we had this understanding and fixed those stakes there was no government monument or section corner anywhere on the north line of section 25. We hunted for one. We could not find any government monument on the quarter corner on the south line of section 25. I had never made any extensive search for the north quarter corner prior to that time. We looked around there sufficiently so that we had information that there could not have been a corner within five rods of where we understood it to be. At that time to my knowledge there was no government corner representing the northwest corner of section 25. *Those are not all the corners that I knew anything about around section 25 at that time. There was a marked stone on the southwest corner of 25.* After establishing that line, Mr.

Peet and I treated it as a boundary line. The fence was taken up from the old line that we had agreed upon and moved west sixty-five rods, and ran nearly as far south as it had been before. It is not my contention that we started from a government corner. We paid Mr. Merrifield for locating all the corners he could in the township. We paid him for locating the corners of section 25. It was my idea, at the time the information was obtained by the employment of Mr. Merrifield, that whatever were the true monuments would have to control my boundaries on the northwest corner of section 25. That is my idea at the present time; that is, monuments put in by the official surveyor.''

It is impossible to reconcile the last-quoted sentence of the plaintiff, the statement in his complaint that the attempt to fix the boundary line was ''to avoid the possibility of a dispute,'' and the further fact testified to by him that ''the fence was erected twelve feet west of the line we established between the two stakes,'' with the assertions of his counsel that the conventional line was intended to be the permanent boundary line dividing the premises in question. On this showing, we think, the court below was justified in directing a verdict for defendant upon the theory that neither party claimed more than to the true line, and that occupancy to the fence was merely subject to the future ascertainment of its proper location. Where this state of facts is shown, the authorities will be found to be practically in accord. (*Lemmons* v. *McKinney,* 162 Mo. 525, 62 S. W. 92.) As said in *Perkins* v. *Gay,* 3 Serg. & R. 327, 8 Am. Dec. 653, by Mr. Justice Gibson, speaking for the supreme court of Pennsylvania: ''If the parties, from misapprehension, adjust their fences, and exercise acts of ownership, in conformity with a line which turns out not to be the true boundary, or permission be ignorantly given to place a fence on the land of the party, this will not amount to an agreement, or be binding as the assent of the parties.''

The burden of proof is always upon the party attempting to show the existence of an agreement fixing the location of a boundary line, and that the boundary so fixed had been accepted

and acquiesced in. (4 R. C. L., Title, "Boundaries," sec. 66; *Jones* v. *Pashby,* 67 Mich. 459, 11 Am. St. Rep. 589, 35 N. W. 152.) The boundary must be one between contiguous lots, and must be doubtful and uncertain. (4 R. C. L., sec. 67, *supra; Randleman* v. *Taylor,* 94 Ark. 511, 140 Am. St. Rep. 141, note, 127 S. W. 723; *Turner* v. *Baker,* 64 Mo. 218, 27 Am. St. Rep. 226; *Galbraith* v. *Lunsford,* 87 Tenn. 89, 1 L. R. A. 522, 9 S. W. [7] 365.) In the absence of a real dispute, an agreement purporting to establish the boundary between the lands of adjacent proprietors, at a line known by both to be incorrect, and the result of which, if it be given effect must be to transfer to the one lands which both know do not belong to him, is without consideration and within the statute of frauds, and consequently void. (4 R. C. L., Title, "Boundaries," sec. 67; *Lewis* v. *Ogram,* 149 Cal. 505, 117 Am. St. Rep. 151, 10 L. R. A. (n. s.) 610, note, 87 Pac. 60.)

It is also well settled that where two adjoining proprietors [8] are divided by a fence which they suppose to be the true line, they are not bound by the supposed line, but must conform to the true line when ascertained. (*Jacobs* v. *Moseley,* 91 Mo. 462, 4 S. W. 135; *Schraeder Min. Co.* v. *Packer,* 129 U. S. 688, 32 L. Ed. 760, 9 Sup. Ct. Rep. 385; 4 Am. & Eng. Ency. of Law, 866, and cases cited; *Kimms* v. *Libby,* 87 Neb. 113, 126 N. W. 869; *Foard* v. *McAnnelly,* 215 Mo. 371, 114 S. W. 990; *Voigt* v. *Hunt* (Tex. Civ. App.), 167 S. W. 745; *Jahnke* v. *McMahon,* 21 Cal. App. 781, 133 Pac. 21; *Lind* v. *Hustad,* 147 Wis. 56, 132 N. W. 753.)

There was, then, under this state of the evidence, no *dispute* concerning the true dividing line, because the monuments were in place and identified by plaintiff's witnesses as such, making certain that which can be made certain. (Rev. Codes, sec. 6206.) No valid agreement between the parties establishing the dividing line could be made under the conditions shown here, because the law will not permit an exchange of title to land without complete observance of the statute of frauds as expressed in section 5091 of the Revised Codes. The case of *Hoar* v. *Hennessy,* 29 Mont.

253, 74 Pac. 452, is in no sense opposed to the views herein expressed, as will be seen by reference to the facts there in issue.

The judgment and order appealed from are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur in the result.

