NEMITZ, Appellant, *v.* RECKARDS et al., Respondents.

(No. 7,235.)

(Submitted September 26, 1934.  Decided December 6, 1934.)

[38 Pac. (2d) 980.]

230

*Messrs. Hall & McCabe,* for Appellant, submitted a brief; *Mr. E. J. McCabe* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, for the Respondent State of Montana, and *Messrs. Freeman, Thelen & Freeman,* for Respondents Reckard, submitted a brief; *Mr. Ernest Abel,* of Counsel, argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an action to quiet title to a tract of land in Cascade county. By a patent in due form from the United States

of America, under date of January 30, 1915, plaintiff was granted the northeast quarter of section 20, township 20 north, range 6 east M. P. M., "according to the official plat of the survey of the said land returned to the General Land Office by the Surveyor General." It is admitted by all parties concerned that plaintiff is the owner of the northeast quarter of the section. It is likewise admitted that the state of Montana is the owner of the northwest quarter of the section. The defendants R. P. Reckards and his wife are the owners and holders of a contract to purchase from the state the northwest quarter of the section.

The allegations of plaintiff's complaint are the usual ones of ownership and right to possession, and adverse claims without right by defendants. The defendants filed a joint answer, denying plaintiff's ownership of the entire tract described in the complaint. They admit plaintiff's ownership and right to possession of all the land lying within the northeast quarter, but deny plaintiff's assertion that all the land described in his complaint is a part of and within the confines of that quarter-section. Thus, under the pleadings, the controversy resolves itself into a question of the right of the plaintiff to claim a strip embracing approximately 30 acres, lying directly to the west of the land admitted by defendants to be owned by plaintiff, and situated in the northeast quarter of the section. In other words, the real question in controversy is that relating to the location of the dividing line between the northeast quarter and the northwest quarter of the section, this line depending on the location of certain section-corner and quarter-corner markings on the south and north sides of the section as established by the United States government survey.

It appears that there is a fence running north and south clear across the section. The defendants claim that this fence marks the true dividing line between the quarters. Plaintiff contends that the true dividing line between the two quarter-sections is at a point 448 feet west of that fence. It is manifest that in order to determine this question, it is of prime

importance to locate the original quarter-section points as established by the government survey.

A certified copy of the field-notes of the surveyor who made 'the original United States survey, and a copy of the original map of such survey, were received in evidence. These field-notes disclose that the quarter-sections were established by the placing of monuments on the north and south boundary lines of section 20, at points equidistant between the east and west corners of the section.

Prior to the institution of this suit plaintiff employed one Chapman, a qualified civil engineer, to survey the northeast quarter. In making that survey, Chapman used the original government survey field-notes as a guide. In accordance with those notes he found the northeast corner of the section as established by the government survey. The original government monument was in place at that point. He then proceeded south along the east boundary line of the section to the southeast corner. He was unable to find a monument or marker at the point indicated by the field-notes as being the location of the southeast corner. Instead, he found the monuments in place marking the southeast corner 106 feet farther south, and in the center of a county road which runs east and west along the south boundary line. Having thus established the southeast corner of the section, he proceeded west along the south boundary of the section 4,712 feet, at which point he came to a county road running north and south. At this point he found in place the government monument establishing the southwest corner of section 20. According to the government field-notes, however, the southwest corner of the section should have been 602 feet farther west of this point. It also appears that he was able to establish the northwest corner of the section, and he located the original monuments for the quarter corners on the east and west section lines. He was unable to find the quarter-section corners on the north and south section lines. In this connection he says that if any monuments were placed at those points, they have become obliterated and lost. He therefore established these quarter

corners upon the boundary line at a point equidistant between the northwest and northeast corners, and the southwest and southeast corners of the section.

Some time after Chapman had made his survey, C. P. Wells, a civil engineer, made a survey to locate the south quarter corner of section 20. Wells, however, did not use the government field-notes as Chapman had done. The four corners of the section found by him in this survey are identical with those found and established by Chapman. Wells also found upon the south boundary of the section a stone marked "¼." This stone was eighteen inches under the ground and in the center of the county road running along the south boundary of the section. He identified it as the quarter corner stone in place along the south boundary as placed by the original government surveyors. The point at which he found this stone is 1,908 feet west of the southeast corner of section 20. At this point there is a fence running north and south across section 20, from the south boundary to the north boundary.

It also appears in evidence that there is a fence running north and south from this point across the section (29) directly south of section 20. The same is true with respect to section 17, which lies immediately north of section 20. It further appears from the field-notes of the government survey that the south boundary line of section 20 is not one continuous tangent from the southwest corner to the southeast corner of the section. Instead, there is a slight variation making two different courses. The intersection of these two courses falls on the point at which Wells found the stone. This fact appears from the testimony of H. B. Lockhart, county surveyor of Cascade county.

Wells testified that in making his survey he measured west from the northeast corner of the section 1,925 feet, at which point he came to the fence running north and south across section 20. At that point he found a fence corner, evidence of pits, a mound of rock lying along the fence, and a stone marked "¼" loose on top of the ground. Thus Wells estab-

lished the north and south quarter corners of the section at the points where the fence mentioned above crossed the north and south boundary lines of the section.

The survey made by Wells and the testimony which he gave at the trial are substantially corroborated by several witnesses. J. S. James, state engineer, H. C. Beering, state land agent, H. B. Lockhart, Cascade county surveyor, and Mack Depew, who had lived in that neighborhood since 1889, all testified that they had seen the rock identified by Wells as being the south quarter monument of section 20. They had all seen it at the point described by Wells, and all expressed the opinion that it was the original quarter monument in place, as established by the government survey. Mack Depew said that it was in place at that point in 1894 and 1895, when he built a fence running north and south across section 29, which adjoins section 20 on the south. He said that he built the fence to that point as being the north quarter corner of section 29. It also appears that James, Beering, and Reckards all examined the north quarter corner as established by Wells, and all of them expressed the opinion that it was the point established by the government as the north quarter corner of the section.

Reckards testified that in 1910 he bought (under contract) the east half of section 17, the section of land lying immediatly north of the northeast quarter of section 20; that in fencing that land in 1910 he ran his fence up to the point established by the Wells' survey as the north quarter corner of section 20; and that the government monument marking the north quarter corner of section 20 and the south quarter corner of section 17 was in place at that point then. He further testified that after purchasing the east half of section 17, he found that it was a short half section, and that although a full mile in length (north and south), it was short in the cross measurement (east and west). In addition to this, there was other testimony to the effect that there is a row of short forties running through this area.

There was admitted in evidence a certified copy of the proceedings of the State Board of Land Commissioners of Montana relative to the survey of and authorization of a resurvey of the township of which section 20 is a part. This was admitted and designated as Defendants' Exhibit E. From the minutes of these proceedings it appears that in 1911 it came to the attention of the State Board of Land Commissioners that the government survey of townships 19 and 20 north, range 6 east, was so defective as entirely to eliminate certain tracts of land claimed by the state. That board thereupon ordered the state engineer to have the two townships resurveyed. This survey was made by one E. I. Leininger. In accordance with this survey, plats were made and submitted to the board and approved by it. Defendants' Exhibit A, admitted in evidence here, is a purported blue-print map of the resurvey and plat of township 20, made by Leininger, and it bears date of December 28, 1912. Prior to the trial of this case an attempt was made to locate Leininger, but he could not be found. From this map (exhibit A) it appears that Leininger, when he made his survey in 1912, found in place the government monuments marking the north and south quarter-section corners of section 20 at the very points where Wells in his survey established those points.

At the time when the resurvey was made, the defendants Reckards had a contract to purchase the northwest quarter of section 20 from the state of Montana. In 1913, after the resurvey was made, the old contract was taken up and a new one was given by the state to the defendants. The new contract was also for the northwest quarter of section 20, but stipulated that such quarter consisted of 175.4 acres. (It is important to note here that in order for the northwest quarter to contain 175.4 acres, the dividing line between that quarter and the northeast quarter would necessarily be at the point contended for by defendants in this case.) This new contract was made to cover a period of twenty years. Subsequently, in 1925, the 1913 contract was surrendered by defendants and they received in its stead an amortization contract, in accord-

ance with the amortization law passed by the legislature in 1925. This was the contract possessed by defendants and produced at the time of the trial.

Plaintiff produced some evidence that the rock found by Wells and Lockhart, and identified by them as a government monument marking the south quarter corner of section 20, was not in conformity with the description of such monument as set out in the original government survey notes. Chapman and Frank Nemitz, son of the plaintiff, testified that prior to the time when Wells made his survey, they tried to find the monument marking the south quarter corner of section 20, and that although they dug at the point where such monument was later found, they found no monument of any kind there at that time.

There is also evidence that a loose stone, which appeared to be a government monument, was found upon the ground along the north boundary of section 20 and a considerable distance west of the point where Wells established the north quarter corner of the section. There is considerable conflicting evidence relative to the government monuments which were found, and alleged to have been found, marking the various corners and quarter corners of section 20, and also relative to the description of these monuments.

Defendants in their answer alleged a boundary line was established for more than twenty years by acquiescence, and that they and their predecessors in interest have been in the open, notorious, and adverse possession of the strip of land in controversy. Plaintiff by reply denied these allegations. At the trial of the case the evidence produced with respect to these issues was conflicting. The defendants produced evidence to prove their allegations of boundary by acquiescence and adverse possession. Plaintiff produced evidence directly to the contrary.

Upon the issues being joined, the case was tried before the court without a jury. At the close of all the evidence the court took the matter under advisement and thereafter made its findings of fact and conclusions of law. It found that

plaintiff was the owner of the northeast quarter of the section; that none of the defendants had ever claimed any title or interest to the northeast quarter; that the dividing line between the northwest quarter and the northeast quarter is the line contended for by defendants; that the points designated by the court in the findings are the true quarter corners of the section as established by the government survey; that the state of Montana is the owner of the northwest quarter of section 20; and that the defendants Reckards are entitled to the possession of that quarter by virtue of a contract to purchase the same. In accordance with its findings of fact and conclusions of law, the court entered judgment for defendants dismissing plaintiff's complaint. From that judgment plaintiff prosecutes this appeal.

Appellant has assigned thirteen specifications of error. Ten of these involve the weight of the evidence and tender the issue as to whether the findings of fact and the judgment are sufficiently supported by the evidence. The other three specifications have to do with the admissibility of testimony.

Logically the latter assignments should be discussed and decided before the weight of the evidence as a whole is finally considered. Three exhibits were offered by defendants and admitted in evidence over the objection of plaintiff.

(a) Exhibit C is a map drawn by the witness C. P. Wells, a surveyor, who made a survey of the land in question and prepared the map. He testified that he made the survey and prepared the map himself, that the map was prepared from his own notes, and that it was correct and in accordance with the facts as he found them on the ground. His qualifications were established. The work being his own and by him declared to be correct, these facts constituted a sufficient foundation for the admission of the map, if it was otherwise admissible. The exhibit was a print or unofficial map made to show the location of the property in dispute and to give a representation of objects and places which the witness could not otherwise show as clearly or as conveniently. The map was properly admitted. (*Drew* v. *City of Butte,* 44 Mont.

124, 119 Pac. 279, and authorities therein cited and relied upon.)

(b) Exhibit E is a certified copy of certain of the proceedings of the State Board of Land Commissioners relative to the lands in question and other adjacent state lands. This certified copy contained extracts from minutes of the land board made at meetings held from December 23, 1911, to February 7, 1914. All the entries related to the lands in question here, and in effect recited that the United States government survey made of these lands, in common with other lands in the vicinity, was incorrectly made, and disclosed that the department ordered a survey thereof by the state engineer; that the lands were surveyed under the direction of that engineer; and that thereafter adjustments were ordered and made by the board to correct acreage inaccuracies then existing in outstanding land contracts. These minutes recited that on March 18, 1913, a plat of the township in question was ordered made by the state engineer, and the same was filed in the state land office.

There can be no question but that the exhibit was made up of public records of a constitutional board having jurisdiction of the lands in question. (Sec. 4, Art. XI, Constitution of Montana; Chap. 60, Laws of 1927.) The entries were made by the board as a record of its consideration of the matter of boundaries of the lands, and long before the plaintiff was granted a patent by the government for the northeast quarter of section 20 here involved. It must be borne in mind that the State Board of Land Commissioners is a body of large discretion and broad powers. (Chap. 60, supra; *State ex rel. Gravely* v. *Stewart,* 48 Mont. 347, 137 Pac. 854.) The office of the board is not a mere recording office. The board does not receive for filing or recording any public documents except those pertaining to its own acts. Its minutes are written memoranda of its official action, at the time of a given transaction, and they were admissible as such if pertinent to the issues of the case.

These records had a material bearing on the controversy. When taken with the testimony of witnesses, they disclosed the facts, among other things, that the state took up and canceled the then existing contract of defendants Reckards for the purchase of the northwest quarter of section 20, and issued a new contract to him in lieu thereof, which latter contract covered an area corrected, or at least changed, to conform to the survey ordered by the board. We think that the records of the State Board of Land Commissioners were material and pertinent, and that they were admissible under sections 10540 and 10543, Revised Codes of 1921. The weight to be given to them was for the court to decide.

(c) Exhibit A, offered by the defendants and admitted over the objection of the plaintiff, is a blue-print of a tracing or map made by order of the board as outlined in the minutes just considered. It appears that the state engineer, in carrying out the order of the board, caused one I. E. Leininger to make the actual survey. The print bears the indorsement: "Office of A. W. Mahon, State Eng'r. Dec. 28, 1912. Survey and plat made by I. E. Leininger, special deputy." There is, however, no certificate by the surveyor and no filing mark. There is evidence in the record to show that the print actually became a part of the record and files of the state land board. Its minutes made on March 18, 1913, disclose that the print was ordered, made, and filed. J. C. Lyndes, an employee of the board for a period of twelve years immediately preceding the trial, testified that during all that time the print, or a duplicate thereof, had been taken and used by the board as a record of the office. The print was sufficiently identified to disclose that it was actually a record of the State Board of Land Commissioners. In any event, it may fairly be said that this plat, when taken in conjunction with the minutes of the board and the testimony of the witnesses, constituted facts as to the common reputation relative to the lines and boundaries of the lands involved. (Sec. 10531, subd. 11, Revised Codes 1921; secs. 10540, 10543, Id.; *Muller* v. *Southern Pac. Ry. Co.*, 83 Cal. 240, 23 Pac. 265; 9 C. J. 274; compare

sec. 1955, Rev. Codes 1921.) The question of how the plat became a record of the office is not as important as the fact that the board adopted it as such, and acted upon it for a long period of time. We think the court was right in admitting the print, with its accompanying explanations, and hence no error was committed by it in that respect.

The assignments of error numbered from 1 to 10 are based upon the assertion, as stated above, that the findings of fact and the judgment are unsupported by the clear weight of the evidence. Concisely, these assignments impugn and challenge the right of the court, under the evidence, to find and hold, as it did, that the true line of division between plaintiff's land (the northeast quarter of section 20) and defendants' land (the northwest quarter of the section) was actually on a line extending between a point beginning 1,923 feet west of the northeast corner of the section and running south clear across the section, to a point 1,908 feet west of the southeast corner of the section. It should be remembered that the four section corners of the section were either in place or established, and that there is no controversy here as to them. The line fixed by the court as the dividing line between the west half of the section and the east half thereof is the one claimed by defendants as the true dividing line between the areas in conflict. The court found that the true line so established ran across the section between the two quarter corners established by the United States government survey. The court's holding, then, was in effect that the quarter corners so recognized by it were actually established by that survey at the respective points indicated.

If the quarter corners were in place as set by the government surveyors, or if they were established as at the points found by the court, the issue is settled by our own statutes. Section 10683, Revised Codes 1921, provides in part as follows: "Rules for construing description of lands. The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful and there are no other sufficient circumstances to determine it: * * *

2. When permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles, or surfaces, the boundaries or monuments are paramount." (See *Myrick* v. *Peet*, 56 Mont. 13, 180 Pac. 574; *Kurth* v. *Le Jeune*, 83 Mont. 100, 269 Pac. 408; *Galbraith* v. *Parker*, 17 Ariz. 369, 153 Pac. 283; *Littlejohn* v. *Fink*, 109 Neb. 282, 190 N. W. 1020; *Pauly* v. *Broadnax*, 157 Cal. 386, 108 Pac. 271; *Golden* v. *City of Vallejo*, 41 Cal. App. 113, 182 Pac. 347.)

There can be no doubt that the boundaries or monuments here are somewhat inconsistent with the measurement as shown by the government survey. Notably the field-notes of the government survey show the width of the section from east to west to be at least 600 feet more than it actually measured on the ground. This fact is borne out by all the several surveyors who ran the courses and made measurements thereafter.

The statement of facts above makes it manifest that there was substantially conflicting testimony as to the actual existence of the quarter corners, either at the points where the court found them to be or at other points. The Leininger map or plat showed them to be at the points fixed by the court. The witness Wells testified that he found the south quarter corner actually in place under the ground, and in this he was substantiated by other witnesses. He testified that the north quarter cornerstone was not exactly in place but was lying on the ground, and that pits were easily discernible and obvious, and in this also he was substantiated by other witnesses.

The plaintiff adduced evidence to the effect that these ██ quarter corners were not in place and that the pits were not there, and generally endeavored to overthrow defendants' case in that particular. It should be remembered that after hearing all the evidence on this controverted point, the court went out upon the ground, in company with representatives of the parties, and made a personal inspection. Its finding on the subject is positive, and, of course, upon that finding depends the judgment subsequently entered and now before us for consideration.

This court has repeatedly recognized the rule that the findings of fact made by the trial court will not be overthrown unless there is a decided preponderance of the evidence against them, and that they will not be disturbed when the evidence discloses reasonable grounds for different conclusions. (*Vesel* v. *Polich Trading Co.*, 96 Mont. 118, 28 Pac. (2d) 858; *In re Columbus State Bank*, 95 Mont. 332, 26 Pac. (2d) 643; *Brown Bros. Lumber Co.* v. *Mitchell*, 95 Mont. 408, 26 Pac. (2d) 969.)

A view of the premises made by the trial judge must be presumed as equivalent to an examination by a jury. Whenever a jury has viewed premises for a better understanding of the testimony of witnesses, the determination of the fact in issue, when supported by some evidence, as here, will not be disturbed on appeal. (*State* v. *Anderson*, 92 Mont. 313, 13 Pac. (2d) 228.)

The real issue in this case, then, is: Did the court have substantial testimony, either standing alone or in conflict with other testimony, to justify its decision that the quarter corners of section 20 were established by the United States government at the points indicated by defendants' testimony and declared by the court to be the true quarter corners? This was a question for the trial court, and it was answered in the affirmative. Under the great weight of authority, we cannot disturb the court's finding in that respect. The judgment should be sustained.

In view of what we have said on the main assignments of error, it is not necessary to discuss other points urged by appellant.

Affirmed.

Mr. Chief Justice Callaway and Associate Justices Angstman, Matthews and Anderson concur.

Rehearing denied January 3, 1935.