No. 12038

IN THE SUPREME COURT OF THE STATE OF MONTANA

1971

_____

GEORGE D. BUCKLEY, et al.,

Plaintiffs and Respondents,

-vs-

JAMES V. LAIRD, et al.,

Defendants and Appellants.

_____

Appeal from: District Court of the Eighteenth Judicial District,
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellants:

Morrow, Nash and Sedivy, Bozeman, Montana.
Edmund P. Sedivy argued, Bozeman, Montana.

For Respondents:

McKinley T. Anderson, Jr. argued, Bozeman, Montana.

_____

Submitted: December 1, 1971

Decided: FEB 7 - 1972

Filed: FEB 7 - 1972

Thomas J. Kearney
Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

Mr. and Mrs. Buckley and Mr. and Mrs. Helppie brought this action in the district court of the eighteenth judicial district, county of Gallatin, to quiet title to a certain strip of land, as against Mr. and Mrs. Laird and Mr. and Mrs. Hall, and all other persons claiming an interest therein. The trial court, sitting without a jury, made findings of fact and conclusions of law and entered judgment for the plaintiffs, and later, judgment nunc pro tunc. The trial court by order denied defendants' exceptions to the findings of fact and conclusions of law, judgment and judgment nunc pro tunc. Defendants appeal.

Plaintiffs Helppie and Buckley own certain land near West Yellowstone, in Gallatin County, Montana, situate in the South Half of Section 21, Township 13 South, Range 4 East. Buckley had purchased the south half of Section 21 from McCracken in 1944. Immediately thereafter, they hired Mr. Papke, a surveyor, and subdivided a portion of the property into Lazy Acres Subdivision. Beginning in 1960 through 1963, Helppie purchased certain lots in Lazy Acres from Buckley, in three separate transactions.

At the time Buckley purchased the property from McCracken, there was a fence on the north boundary of the property. This fence was mostly down but the posts and wire were visible and Buckley showed Papke the fence, prior to his survey. The plat of Lazy Acres as prepared by Papke was filed with the clerk and recorder of Gallatin County in 1948. Papke determined and set forth in his plat that the east-west center line of Section 21 was the north boundary of Lazy Acres. This north line of Lazy Acres corresponds with the previous fence line.

Defendants, Laird and Hull, at the time of trial, claimed to own all the land south of U.S. Highway 191 and north of the north line of Lazy Acres Subdivision. James V. Laird, and his sister Mrs. Hull, acquired their interest in the land after the death of their father in 1951. Their father had acquired the land by deed in 1926, from Mr. and Mrs. Wakefield. The deed described the land so acquired as being the "East half of the northwest quarter (E 1/2,NW 1/4) and the west half of the northeast quarter (W 1/2, NE 1/4), all located in the North Half of Section 21, of Township 13 South, Range 4 East." The Laird family had been on the property since 1904, and Laird had been familiar with the land since 1917.

After Helppie completed purchase of the last of Lazy Acres in 1963, they hired a surveyor, Thomas J. Hallin, to survey the lands concerning their boundary line between their property and Lairds' property. Hallin completed his survey in 1965, and delivered the plat to Helppie. The plat has never been recorded. Hallin concluded that, in his opinion, the true east-west center line of Section 21 was about forty feet north of the north boundary of Lazy Acres, as surveyed and platted by Papke. A total of about two acres ot land is in dispute.

Since about 1940, there has been a cabin home on the Laird property. There has been an outhouse on the two acre strip of land in dispute which was built by the Lairds in 1942, and used by them ever since in conjunction with the cabin home. Laird had also used the strip of land, now in question, for cutting green trees and firewood, walking, planting trees, and other general use. Dad Laird had told both his daughter Mrs. Hull, and her husband Mr. Hull, in 1937, that the south boundary of his property was at the fence line.

Laird and Hull offered as evidence tax receipts showing that since 1954, through 1967, they had paid all the taxes on the Laird land known as Tract H. Laird paid the taxes on four-fifths of the land and Hull paid the taxes on one-fifth. Track H is that portion of the land in the north half of Section 21, lying south of the current U.S. Highway 191, and north of the north line of Lazy Acres, which includes the two acres now in dispute. Tract H was surveyed out by Laird on August 1, 1951, and the survey was filed for record along with deed dated November 17, 1953, from Mrs. Vella E. Laird to James V. Laird, of Tract H, consisting of 13.35 acres.

Thereafter, the tax receipts recite the payment of taxes by Laird and Hull on land in the north half of Section 21, "South of Highway Desig.. on Assessor's Plats as Tract H". Laird was originally paying the taxes on 10.68 acres of the land and Hull was paying on 2.67 acres. Later, after 1960, when approximately 2.8 acres of Tract H was deeded to the State Highway Commission for right-of-way, Laird paid the taxes on 8.42 acres and Hull paid the taxes on 2.10 acres.

Buckley admitted that the two acre strip of land had never been used by him for any purpose. Mr. Buckley thought that the fence had been built in 1935, and described it as a barbed wire fence on posts. The fence was in such shape that anyone could still follow the line today. Buckley, after selling Lazy Acres Subdivision to Helppie, retained only a tract of land of approximately two acres, which was also platted by Mr. Papke in August 1961, using his previously determined center line. The Buckley land is located west of Lazy Acres. Mrs. Buckley admitted that they at no time ever made claim for or went beyond the fence line, which corresponded with the Papke survey, as they assumed the fence line

was the boundary line between the properties. Although tax receipts were offered by Buckley to show payment of taxes on land in the south half of Section 21, Mrs. Buckley admitted that they assumed they were only paying taxes to the fence line.

Helppie claims title to the two acres of land in dispute, which lies between the northern boundary of Lazy Acres Subdivision and the east-west center line of Section 21, as found by surveyor Hallin. Helppie claims to have paid taxes on the two acre strip. However, the tax receipts offered by Helppie reveal that from the period 1960 to 1965, they only paid taxes on "Lazy Acres Subdivision Lots 2 through 5 and 8, through 11, 16, 17, 20, 21, 28 and 29." In 1966, receipts were offered by Helppie which reveal that in addition to the Lazy Acre lots, they paid taxes on "Tract B as Design. Assessor's Plat being in SW 1/4, less HW 21 13S 4E 14.35". No evidence was ever offered to show where Tract B was, other than on its face; this 14.35 acre tract is in the south half of Section 21, and hence has nothing to do with the two acres in dispute.

In 1967, Helppie offered their receipt to show that they also had paid taxes on property described as "That portion E 1/2-NE 1/2-SW 1/4 lying W of Lazy A.Sub & S. of W.Y. HW. 21 13S 4E 15.46". Again, this land is clearly located in the south half of Section 21, and also west of the Lazy Acres Subdivision, and hence does not cover the two acres in dispute.

The tax receipts offered by Buckley similarly show that Buckley paid taxes on various lots in Lazy Acres Subdivision during periods from 1954-1956, and in 1960, and from 1963-1967. Buckley also paid some taxes on the 14.35 acre Tract B, beginning in 1954, and on Tract W, described as "being 150' x 150' in NW 1/4-SW 1/4, IND. SITE". No evidence was offered that either Tract W or Tract B had anything to do with the two acre tract of land in dispute.

Mr. Helppie admitted that when he first purchased the property from Buckley in 1960, he observed the wire fence. After receiving the Hallin survey, Helppie built a jack-log fence along the Hallin east-west center line of Section 21, but by the next spring someone had moved it back to the original fence line on the east-west center line previously established by surveyor Papke. Helppie never consulted Laird about the new fence, prior to building it. Mr. Helppie admitted that they had made no other use of the two acre strip in dispute.

Appellants set up three issues on appeal.

(1)  Are defendants Laird entitled to the two acre strip in dispute by adverse possession?

(2)  Are defendants Laird entitled to the two acre strip by acquiesence?

(3)  Are defendants Laird entitled to the two acre strip because the Papke survey line is the true and correct east-west center line of Section 21?

Respondents approach the problem from Issue No. 3. Basically, respondents assert that all the parties intended to claim only to the true east-west center line of Section 21, when it was established by a proper survey. They then reject the Papke survey as indicated on their own official plat, hire a new surveyor Hallin and assert Hallin's survey as the only "proper" survey.

Hallin's critical points in his survey were the quarter corners on the north-south section lines of Section 21. On the west section line, between Sections 20 and 21, Hallin made some independent judgments and reestablished the quarter corner. He admitted that his reestablished quarter corner was about 50 feet north of a point equi-distant between the section corners.

·The 1901 U.S. government survey plat shows the quarter corner to have been established equi-distant. In the 1930 resurvey, the resurvey notes show no evidence oɪ a quarter corner at 40 chains north of the SW corner of Section 21. In reestablishing the quarter corner, the true point for the quarter corner was 39.75 chains. This was noted to "fall in middle of highway to West Yellowstone, bears N.W. & S.E., impracticable to set cor." A witness corner was set at 40.20 chains and marked with an iron post and brass cap. This same witness corner was used to witness the 1/4 corner of Section 20, which was 40.59 chains from the SW corner of Section 21. The notes show the witness corner to be in feet, 29.7 feet north of the 1/4 corner of Section 21 and 25.74 feet south oɪ the 1/4 corner of Section 20. As the survey line on the section line continued northerly, it was found that the section corner common to Sections 16, 17, 20 and 21 was 79.50 chains north oɪ the south section corner. By computation therefore, the west quarter corner of Section 21 was 39.75 chains north and 39.75 chains south of the corners, or equi-distant.

Yet, Hallin found different measurements and, therefore, made his independent judgment that the 1/4 corner was 50 feet north of that point. He concluded and reestablished his own quarter corner so that the south 1/2 section lines measured 2668.43 feet, while the north half measured 2576.55 feet, or a difference of 91.88 feet. His reestablished quarter corner wound up 29.70 feet south of the witness corner oɪ the 1930 survey; but this point wound up what Hallin estimated to be some 8 or 9 feet north of the center line of the road. Now then, Hallin's 1/4 corner jibed with one measurement of the 1930 resurvey; that measurement being 29.70/south of the witness corner. Hallin's 1/4 corner did not

·feet

jibe in measurement to either section corner with the 1930 resurvey;

nor did it jibe with the available notes from the original 1901 survey, nor another 1917 survey.

On the east section line, Hallin surveyed in a similar manner, except that there he reestablished the 1/4 corner by proportionate measurements.

Hallin then ran a straight line between his reestablished east and west 1/4 corners. None of the existing old fence lines, the Lazy Acres measurements, corners of an existing school acre, nor other survey marks correspond with Hallin's new division line; but this new line became in respondents' eyes the "proper" line and, further, the "true" line to which all adjoining properties must adhere.

Hallin admitted that he disregarded the other marks and evidences of property lines because, as he put it, "inasmuch as I could find no basis or evidence of a survey at the time I did this work, we didn't (sic) disregard it and went to the method I described to find the east-west centerline." [Hallin did disregard all other evidences other than his own "method".] Hallin did not discuss the problem with other landowners, nor did he seek out any other information concerning the east-west center line or any other monuments, natural or artificial. Interestingly, defendant Laird is a licensed engineer and surveyor who has been familiar with the ground for his entire lifetime and, although an interested party, he was not contacted by Hallin.

Laird testified that the old fence in question was built in about 1917, fifteen to sixteen years after the 1901 government survey, and that he had used and referred to the fence line in a deed description in 1939, when some six acres of property had been transferred to his brother. The "old fence" was referred to in three other deeds for boundary indentification. Laird also

testified: That the east-west road was in use and surveyed in 1917. That the road was constructed upon the original 1901 government east-west center line and from his investigation he concluded that the original east quarter corner was some eighteen to thirty-eight feet south of Hallin's quarter corner monument and almost on the Papke survey line. That in all of the recent deeds from him and his family to the Montana Highway Commission the Papke survey had been used as the basis of the description, and the deeds had been approved.

It was Laird's opinion that the witness corner from the 1930 government resurvey should have reference only to the east quarter corner of Section 20, rather than the west quarter corner of Section 21, although the 1930 notes purport that it applies to both. The notes and plat survey of 1930 reveal that the government surveyors were at that time only surveying for Sections 18, 19, 20, 28, 29, 32, 33 and 34, of Township 13 South, Range 4 East, which had been unsurveyed and that Section 21 had been the subject of the 1901 survey. The notes of the 1930 surveyor reveal that he was unable to locate the west quarter corner of Section 21, as set by the 1901 survey. The notes further reveal the surveyor did decide the quarter corner should be in the middle of the highway but there is no evidence that surveyor ever went upon Section 21 to look for monuments such as the existing fence.

Hallin was hired by Helppie to perform a resurvey of the east-west center line, as set forth in the 1901 survey. The rules for resurveys have been set forth in 12 Am Jur 2d, Boundaries, §61, p. 599:

> "Resurveys.
>
> "In surveying a tract of land according to a former plat or survey, the surveyor's only duty is to relocate, upon the best evidence obtainable, the courses and lines at the same place where originally located by the first surveyor on the ground. In making the resurvey, he has the right to use the field notes of the original survey. The

object object of a resurvey is to furnish proof of the location of the lost lines or monuments, not to dispute the correctness of or to control the original survey. The original survey in all cases must, whenever possible, be retraced, since it cannot be disregarded or needlessly altered after property rights have been acquired in reliance upon it. On a resurvey to establish lost boundaries, if the original corners can be found, the places where they were originally established are conclusive without regard to whether they were in fact correctly located, in this respect it has been stated that the rule is based on the premise that the stability of boundary lines is more important than minor inaccuracies or mistakes. But it has also been said that great caution must be used in reference to resurveys, since surveys made by different surveyors seldom wholly agree. A resurvey not shown to have been based upon the original survey is inconclusive in determining boundaries and will ordinarily yield to a resurvey based upon known monuments and boundaries of the original survey."

Since 1895, Montana has had a statute, now known as section 93-2201-4, R.C.M. 1947, which provides:

"Rules for construing description of lands. The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful and there are no other sufficient circumstances to determine it:

"* * *

"2. When permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles, or surfaces, the boundaries or monuments are paramount."

The early Montana case of Myrick v. Peet, 56 Mont. 13, 20, 22, 180 P. 574, further discussed rules concerning resurveys:

"'Before courses and distances can determine the boundary, all means for ascertaining the location of the lost monuments must first be exhausted.' (Tiedeman on Real Property, sec. 832).

> "'Prima facie, a fixed visible monument
> can never be rejected as false or mistaken
> in favor of mere course and distance as the
> starting point, when there is nothing else
> in the terms of the grant to control and over-
> ride the fixed and visible call. The general
> rule that courses and distances must yield to
> natural or artificial monuments rests upon the
> legal presumption that all grants and convey-
> ances are made with reference to an actual view
> of the premises by the parties.' (Tyler on
> Ejectment, 569; Garrard v. Silver Peak Mines (C.C.)
> 82 Fed. 585, and cases there cited.

> "'Monuments are facts; the field-notes and
> plats indicating courses, distances, and
> quantities are but descriptions which serve
> to assist in ascertaining those facts.' (Martin
> v. Carlin, 19 Wis. 454, 88 Am.Dec. 696.) When
> there is a conflict between monuments and courses
> and distances, the latter must yield to the former.
> (Devlin on Real Estate, sec. 1029). * * *

> "The law, therefore, is that where monuments can
> be recognized by competent civil engineers, they
> are to be taken as the guide in fixing boundaries."

In Vaught v. McClymond, 116 Mont. 542, 155 P.2d 612, this Court restated the rules enunciating the same principles. Respondents cite Vaught for language, emphasizing the surveyor's duty to relocate, upon the best evidence obtainable the original courses and lines. Respondents insist that Hallin used the "best evidence".

The Hallin resurvey cannot control the location of the east-west center line, because Hallin disregarded the basic rule, to give greater weight to the monuments than to mere measurements. In fact, Hallin completely disregarded all the artificial monu-ments--the road, the REA power pole, the school acreage, and the fence, not to mention the outhouse.

The three government surveys in 1901, 1917, and 1930 are inconsistent and inaccurate. For example, the 1901 survey does not even attempt to locate the west quarter corner of Section 21. It located the east quarter corner of Section 21, and placed

it an equi-distant 40 chains  from  the northeast corner and 40 chains from the southeast corner.  A reasonable assumption would be that the west quarter corner would also be 40 chains from the northwest corner and 40 chains from the southwest corner.

However, in 1917, the surveyor claimed he found a west quarter corner, which was 39.17 chains from the northwest corner.  This surveyor did not measure the distance from his purported west quarter corner to the southwest corner to see if this in any way checked with the 1901 survey.

Later, in 1930, the surveyor finds no trace of any west quarter corner of Section 21, but he measures to a point equi-distant between the northwest corner and the southwest corner, and finds the distance to be 79.50 chains.  He then sets a quarter corner which is 39.75 chains  to  the northwest corner and 39.75 chains to the southwest corner.

Finally, in 1964, surveyor Hallin comes along and, using the 1930 surveyor's witness corner, establishes his own west quarter corner which measures 2576.55 feet from the west quarter corner to the northwest corner and 2600.26 feet from the west quarter corner to the southwest corner, for a total of 5176.81 feet.

Yet, the 1930 survey found the total distance between the northwest corner and the southwest corner was 5244.98 feet or 79.5 chains.  In between, the government surveys and the Hallin survey, Papke apparently finds the west quarter corner and the east quarter corner of Section 21, and when he ties them up, the east-west center line of Section 21 happens to coincide with the old fence, running east and west across the middle of Section 21. Later, Laird finds in his survey, that the Papke survey line of the east-west center line coincides with the school acreage in Section 21, and also coincides with an REA pole in Section 21.

Out of this maze, several conclusions can be drawn. First, after the 1901 survey, none of the other surveyors, other an Papke and Laird, ever purported to pay any attention to the artificial monuments. In fact, the 1917 and 1930 surveyors did not even indicate in their notes that they went upon the ground of Section 21 to look for monuments.

Second, Hallin only compounded the error, because rather than talking to the people who had lived in the area, such as Laird, and rather than giving consideration to the artificial monuments, most of which had been there prior to 1930, such as the road and fence, Hallin chose to follow the 1930 survey and some of its survey monuments, including the 1930 witness corner for the west quarter corner, which, admittedly, were placed without giving consideration to the existing artificial monuments. However, Hallin's measurements and location of the west quarter corner do not even correspond with the 1930 survey.

Finally, the result of the Hallin survey runs contrary to Hallin's own admission, that no surveyor, after the 1901 survey, including the later government surveyors, should have any right to change the location or amount of a man's property. Yet, this is exactly what the Hallin survey purports to do. The Papke survey tended to preserve the existing locations of property of the owners living in the area at that time. In fact, Hallin admitted that if from the 1901 survey either the surveyor or the property owners established the west quarter corner at a point equi-distant from the northwest corner and the southwest corner, the west quarter corner would be at a point fifty feet south of where Hallin has it now designated, and at a point just about exactly in line with the Papke survey.

In summary, the Papke survey is consistent with the general rules of land description and survey and deviates the least from the original 1901 survey. The east-west center line of Section 21, as found by Papke, is held to be the true survey of this line, rather than the Hallin center line, which purports to disrupt and change the existing property lines, not only between Helppie and Laird, but also affecting all adjoining land owners not a party to this action, such as Mr. Kephart, the United States Forest Service and the state of Montana, by virtue of its school lands.

Having found that the trial court was in error in adopting the Hallin survey and that the Papke survey of the disputed area is the correct one, it is not necessary to discuss Issues 1 and 2, adverse possession or acquiescence.

The judgment is reversed and the cause remanded for entry of judgment in favor of appellants.

_Wesley Castles_

Associate Justice

We Concur:

_James T. Harrison_

Chief Justice

_Frank I. Haswell_

_John Conway Harrison_

_Gene B. Daly_

Associate Justices