KRAMER, RESPONDENT, *v.* DEER LODGE FARMS CO. ET AL., APPELLANTS.

(No. 8357.)

(Submitted November 23, 1943. Decided May 8, 1944.)

[151 Pac. (2d) 483.]

154

*Mr. S. P. Wilson,* for Appellants, submitted an original and a supplemental brief, and argued the cause orally.

*Messrs. W. E. Keeley, James B. Castles* and *K. W. MacPherson,* for Respondents, submitted an original and a supplemental brief; *Mr. Keeley* argued the cause orally.

MR. JUSTICE ADAIR delivered the opinion of the court.

This is an appeal from a judgment for plaintiff involving the use of a stream of fresh running water in the water shed of Dempsey Creek in Powell County, Montana.

The complaint originally set forth two causes of action. In the first cause of action plaintiff based his claim to the prior use of 150 miner's inches of water by *right of appropriation.* In the second cause of action plaintiff based his claim of right by *adverse use* for more than the statutory period. At the trial, by motion of defendants, the plaintiff was by the court required to elect upon which cause of action he would stand. Plaintiff elected to stand solely upon his claim of right *by appropriation* and he then and there abandoned his claim of right *by adverse use.* No error is assigned in the action of the trial court ordering such election, hence the question as to plaintiff's claimed right by *adverse use* is entirely eliminated from the case. To prevail herein the plaintiff's evidence must show a prior right in him *by appropriation* to the use of the waters claimed.

Dempsey Creek rises on the eastern slope of a north and south mountain range in Powell County, and flows thence in a gen-

erally easterly direction for a distance of about 18 or 20 miles where it empties into the Deer Lodge River. The land along Dempsey Creek and in the water shed thereof is owned by various parties, who, during the irrigating season divert the water from Dempsey Creek and use it on their land. Such waters are diverted directly from Dempsey Creek by means of numerous ditches which tap the creek. Commencing about 12 miles upstream from the mouth, ·these ditches tap the creek at various places between such upper diversion point and the mouth of the creek.

Dempsey Creek flows in a northeasterly direction through the "William Walker Ranch" comprising 253 acres described as the N½ of the NW¼; the SE¼ of the NW¼; the NE¼ of the SW¼; the W½ of the NE¼; and the NW¼ of the SE¼ of section 5, T. 6 N., R. 9 W. less a certain 27 acre strip sold off the east end thereof. The original owner of the ranch was William Walker, who occupied it from 1866 to 1887, when he conveyed to Herman Johnson, who owned and occupied same until 1902, when he conveyed the ranch to the plaintiff herein, Max Kramer, who is the present owner.

On September 19, 1891, Peter Johnson, who then owned the Michael Grace Ranch to the west of the William Walker Ranch, commenced in the district court Cause No. 404 against 21 defendants including Herman Johnson who then owned the William Walker Ranch, for the purpose of adjudicating the rights and priorities of all the parties to said suit in and to the waters of Dempsey Creek.

On April 24, 1892, a decree was made and rendered in said Cause No. 404 wherein the district court disposed of some 21 separate water rights specifying therein the amount each of the parties was to receive and also their order of priority. The plaintiff Max Kramer's immediate predecessor, Herman Johnson, was dissatisfied with the disposition of the waters of Dempsey Creek as set forth in said decree and appealed to this court. (See *Johnson* v. *Bielenberg*, 14 Mont. 506, 37 Pac. 12.) As finally adjudicated ·by the decree in Cause No. 404, there was

156

awarded to Herman Johnson for use on the "William Walker Ranch": (a) right No. 6 of 50 inches as of 1867; (b) right No. 11 of 40 inches as of 1871; and (c) right No. 21 of 110 inches as of 1891, the later being junior to all the other rights decreed in the action.

The doctrine of *res adjudicata* applies to water cases. The final decree of 1892 made in Cause No. 404 is binding and conclusive between all the parties to the suit and their privies and successors in interest, as to all matters adjudicated therein and as to all issues which could have been properly raised irrespective of whether the particular matter was in fact litigated. (*Bieser* v. *Stoddard*, 73 Colo. 554, 216 Pac. 707; *Campbell* v. *Wyoming Development Co.*, 55 Wyo. 347, 100 Pac. (2d) 124, 102 Pac. (2d) 745. See also *Lokowich* v. *City of Helena*, 46 Mont. 575, 129 Pac. 1063; *Howell* v. *Bent*, 48 Mont. 268, 137 Pac. 49; *In re Smith's Estate*, 60 Mont. 276, 199 Pac. 696; *Zosel* v. *Kohrs*, 72 Mont. 564, 234 Pac. 1089; *State ex rel. Golden Valley Co.* v. *District Court*, 75 Mont. 122, 242 Pac. 421; *Blaser* v. *Clinton Irr. Dist.*, 100 Mont. 459, 53 Pac. (2d) 1141; *State ex rel. Sullivan* v. *School Dist. No. 1*, 100 Mont. 468, 50 Pac. (2d) 252; *Swaim* v. *Redeen*, 101 Mont. 521, 55 Pac. (2d) 1; *State ex rel. Silve* v. *District Court*, 105 Mont. 106, 69 Pac. (2d) 672.)

On December 20, 1935, the plaintiff Max Kramer commenced the present action against some 44 defendants, seeking to have the court adjudge him to have a first and prior right to the use, for irrigating purposes on the "William Walker Ranch", of 150 miner's inches of the waters of a certain stream of fresh running water, the natural channel of which connects and joins with the main and natural channel of Dempsey Creek at a point about two or three miles above the point where Dempsey Creek empties into the Deer Lodge River. The plaintiff Max Kramer and each of the 44 defendants in the instant suit are each and all successors in interest to the original parties to Cause No. 404 wherein judgment was made and filed almost 43 years before the present suit was commenced.

When the appropriators of the waters of Dempsey Creek ap-

pealed to the district court for an adjudication of their rights in Cause No. 404, they appealed to the public force and the decision rendered in that cause, unless and until regularly modified, remains for all time. The rights given each litigant under the decree are property rights upon which his security depends. In the decree the court gave to the parties thereto the right to use specified quantities of water as of dates fixed. It is the duty of the court to protect the rights of the litigants which were found and determined by the provisions of that decree. The decree is not merely a basis for a new procession of water suits. (*Gans & Klein Investment Co.* v. *Sanford,* 91 Mont. 512, at page 520, 8 Pac. (2d) 808.) The decree in Cause No. 404 is just as operative today as it was on the day in April, 1892 that it was rendered. The decree specifies the exact *maximum quantity* in miner's inches of water that each litigant should be entitled to use. It sets forth *the order* in which the respective litigants were to use the waters so allotted to them. The decree requires that each litigant "must make reasonable use of the water allotted to him and that *said waters when not so used, or the surplus thereof, must be turned in to the said Dempsey Creek.*" Thus, by its express terms, does the decree require that, after the litigants have made reasonable use of the water up to the maximum amount allotted to each and in the order named in the decree, all of the waters not so used and all of the surplus of such waters "must be turned in to the said Dempsey Creek" to the end that same shall be available for the use of the other decreed users.

The decree also contained an injunctive provision which reads: "It is further ordered and adjudged that the defendants, and each of them, be and they *are hereby enjoined and restrained forever from diverting or interfering with the waters of said Dempsey Creek,* except that each of said defendants and the plaintiff may, in the order named, make reasonable use thereof in the amounts named and for the purposes mentioned, and *until each has used the water in the manner and amounts mentioned the plaintiff and each of the defendants is restrained from*

*using and diverting the same.''* Since each party to the instant suit is a successor in interest to some party in Cause No. 404, the decree rendered in that action in 1892 fixes not only the rights of the plaintiff Max Kramer but it likewise fixes the rights of each and all defendants in the present action in or to the use of the waters of Dempsey Creek and its tributaries.

The complaint herein alleges: ''That on or about the first day of April, 1872, *by means of dams and ditches, constructed to and sufficient to, divert said water from said slough* to carry the same to and upon the lands of the plaintiff above described, for the purpose of irrigating said lands, plaintiff and his predecessors in interest duly appropriated of the waters of said slough, one hundred fifty (150) miner's inches of water, * * * *and diverted said waters from said slough,* and flowed the same to and upon the lands above described, and there used said waters for irrigation, domestic and other useful purposes, and that the plaintiff and his predecessors in interest, commencing with on or about April 1st, 1872, have used said waters so appropriated, and all thereof, during the irrigating season each year for the irrigation of the said lands of the plaintiff, and that plaintiff is now using said waters for that purpose, and that all of said one hundred fifty (150) miner's inches of water so appropriated is and are, and at all times herein mentioned were, necessary for the proper irrigation of said lands.''

The complaint also alleges: ''That while said slough flows towards Dempsey Creek, also wholly situate in Powell County, State of Montana, said slough is not now, and never has been, a tributary of said Dempsey Creek.''

The answers of the appealing defendants each and all denied the allegation that, ''said slough is not now, and never has been, a tributary of said Dempsey Creek.'' Thus was the burden cast upon the plaintiff Max Kramer to establish such controverted allegation or fail in his action. If, on September 19, 1891 when Cause No. 404 was commenced, the ''unnamed stream'' or ''slough'' then fed or contributed to the waters of Dempsey Creek, then the decree thereafter and in April, 1892

rendered therein concludes the plaintiff Max Kramer from here asserting more than 40 years later, that he has a first and prior right by appropriation as of 1872 to the use of the waters flowing in such tributary. (*Ryan* v. *Quinlan,* 45 Mont. 521, at page 531, 124 Pac. 512, at page 515.)

The chief issue, as between the appealing defendants and the plaintiff Max Kramer, therefore, is whether the "unnamed stream" or "slough" is a tributary of Dempsey Creek.

A tributary is a stream feeding or contributing water to a larger stream or lake.

The complaint alleges: "That said slough is now, and at all times herein mentioned has been, a natural stream of fresh and running water, flowing in an easterly direction, in a regular and defined channel with regular and defined beds and banks, * * * to the point or points, or place or places thereon, where the defendant does now divert, and at all times hereinafter mentioned he and his predecessors in interest have diverted the waters flowing in said slough to and into his ditch and ditches, as hereinafter more particularly described, * * *." At and prior to the date of the decree of 1892, this so-called "unnamed stream" had and it still has its source in the SE¼ of Section 1, T. 6 N., R. 10 W. From thence it flowed easterly through lands then owned by the Quinlans who were parties defendant in the original water suit No. 404 to a point near the southwest corner of the SE¼ of the NE¼ of section 6, T. 6 N., R. 9 W. where, at a point about 100 feet easterly from the county road, which runs northerly and southerly on the dividing line between the east half and the west half of said section 6, its natural channel joined the main channel of Dempsey Creek, the two channels describing a narrow letter V the base of which V corresponds with the junction point of the "unnamed stream" with Dempsey Creek. The ditches of most of the adjudicated users of the waters of Dempsey Creek take their waters therefrom at points above the junction of the "unnamed stream" with Dempsey Creek but other adjudicated users have ditches, including ditches Nos. 10, 11, 13, 14, 16 and 17, which

tap Dempsey Creek below said junction point. These downstream users must depend upon the waters flowing in Dempsey Creek below the junction point and their rights have been, are and will be affected by any upstream use of the waters which prevent their return to the creek or which diminish their quantity. The source of supply for the so-called "unnamed stream" is Dempsey Creek water diverted therefrom by the upstream ditches of upstream users. Some of those ditches discharge Dempsey Creek water directly into the slough while other ditches conduct Dempsey Creek waters to agricultural lands above the slough from which lands the waste, run off or surplus waters drain, flow, drop or seep into the slough in their downward course as they flow back towards Dempsey Creek. Were it not for the "dams and ditches constructed to and sufficient to, divert said water from said slough" which plaintiff affirmatively pleads have been constructed by him and his predecessors in interest, the waters so running in the slough would course through the natural channel thereof down to the lower or easterly end of the slough where they would be discharged into Dempsey Creek. There would be no other place for these 150 miner's inches of water running in the slough to go except into Dempsey Creek were it not for the dams and ditches of the plaintiff which divert the water from the slough and away from Dempsey Creek as is shown, not only by the testimony adduced at the trial, but also by the map which plaintiff introduced in evidence as his exhibit 1, which map is here reproduced:

The slope of the land to the north of Dempsey Creek near the head of the slough is naturally to the north towards the slough. The plaintiff Max Kramer testified: "The creek has no outlet that way towards the slough except through ditches but them are good water rights. *They are the first and they have a good big flow. The more they have got the more is in the slough. That is what formed the slough.*"

The witness Mike Lowry lived on the Quinlan brothers' ranch at the upper end of the slough from June 11, 1890 to the spring of 1925. He testified that after the adjudication of Dempsey Creek in 1892, he observed an increase in the flow of the water in the slough and that there were times when it was very high with *"drop water."* He also testified:

"Q. And what do you mean 'drop water'? A. Irrigation water that drops into the slough.

"Q. And that would come from the lands above the slough? A. Yes, sir. * * *

"Q. When you first came to live in the valley and worked at Quinlan ranch was there enough water in Quinlan Slough to be used for irrigation? A. No, not to amount to anything.

"Q. How much would you say? A. Well, after the drop water quit coming in there was very little, possibly 14 or 20 inches.

"Q. Was there much drop water coming in before Dempsey Creek was adjudicated? A. No.

"Q. Do you know why of your own knowledge the adjudication of Dempsey Creek increased the flow of Quinlan Slough? A. There was more farming done and more water came down. The ranchers near the mouth had the advantage and used it there. There was no way to stop them. It had never been proven who the water belonged to before it was adjudicated.

"Q. After the creek was adjudicated was the water used lower down? A. It came where it belonged.

"Q. And closer to the slough? A. The rights came down along the creek as they were, the early rights came down and naturally people irrigated more. I know Quinlans the first year I was

there in 1890 put up about 40 tons of hay on 6 or 7 acres of land. The only hay was between the creek and the slough on about 100 acres of land.

"Q. And later did they put more hay up? A. Yes, after the water was adjudicated and everybody got their water they did. The No. 1 right on the creek, 2/3 of No. 4, 192½ at No. 8, 27½ at No. 4, 105 at 1, that water was all spread out on Quinlan land.

"Q. Above the head of the slough? A. And south of the slough.

"Q. In your observation of the slough during the time you lived near it did you ever observe any water in the form of springs raising in the slough? A. Yes, sir.

"Q. Where were those springs located? A. One was right below the forks of the slough below the line fence.

"Q. The line fence is on the meridian line between Section 6 and 1? A. Yes.

"Q. And where else did the water raise? A. Above; that is, some raised—it is hard to say they were springs—it was oozing out along the bank in different places. One place was a spring and later opened up and you could see water boiling right out, in fact we used some of it for house use.

"Q. In Section 1? A. In Section 1 below the guide meridian line.

"Q. Do you know if any part of the slough raises outside of Section 1; that is, outside of that portion that may arise in Section 6? A. Well that is above the meridian line in the Quinlan field as the map shows where the slough is.

"Q. Referring to the map Exhibit 1, I will ask you if the map clearly shows the head of Quinlan Slough. The map showing the head of Quinlan Slough is located in the southeast quarter of Section 1. A. That is the north fork. They both head in that quarter section.

"Q. Both forks of the slough head in the southeast quarter of Section 1? A. Yes.

"Q. At any rate on the place marked on the map as being the head of the slough? A. Yes."

For many years the county road crossed Dempsey Creek by means of a wooden bridge and, about 50 to 80 feet northerly therefrom, there was a second wooden bridge which spanned the slough. At the time of the commencement of Cause No. 404 in 1891 and continuing up to 1911, the natural channel of the slough ran into and joined that of Dempsey Creek about 100 feet below, i. e. easterly from said wooden bridges.

The plaintiff Max Kramer who acquired the ranch in 1902 testified: "When I came on the place first the creek and slough didn't connect till down below the road."

Plaintiff's first witness, George Johnson, Sr., had been familiar with the creek, slough and wooden bridges since 1872. He testified that he remembered frequently seeing streams of water running in both the slough and the creek and that the streams came together and united "to the east of the road."

Plaintiff's second witness, Henry Hendrickson, was familiar with both the slough and the creek. He had worked on the county road in 1893 or 1894 at which time his father was county road supervisor. He testified that the contour of the land was such that there was no other place for the water running in the slough to go except to flow into Dempsey Creek were it not for a ditch constructed by Herman Johnson in 1900 (eight years after the 1892 decree), which tapped the slough about 100 feet above its junction with the creek and a few feet below the wooden bridge, spanning the slough at the county road. This new slough ditch was of a size sufficient to carry 150 to 200 inches of water and all the water which flows through its intake runs down the natural channel of the slough to within about 100 feet of Dempsey Creek where it is diverted into the head of the new slough ditch.

Plaintiff's third witness was his son-in-law, Frank Beck, who testified that the channel of the slough runs into the channel of Dempsey Creek and "that Quinlan Slough has no other place to go except join with Dempsey Creek."

Plaintiff's fourth witness, Glen Foley, was water commissioner on Dempsey Creek in 1914, 1915 and 1927. He testified

that when he first saw the slough its natural channel led to Dempsey Creek through which the "water would go into the creek as in its natural course" and that when not diverted through plaintiff's ditches the waters of the two streams would come together about at the road.

Plaintiff's fifth witness, Ben Goldie, had been a resident of the Deer Lodge Valley since 1878. He was road supervisor in 1916. In July of that year he rebuilt the two wooden bridges spanning the creek and the slough at the county road. He testified that water was flowing in the streams and that it was necessary to wear boots when rebuilding the bridges.

The next witness, W. P. Johnson, was born near the slough in 1877 and had since resided there. He testified that in his boyhood days water flowed in the slough "the year through in those years" and that the slough and the creek came together a short distance below the county road and that below such junction "they were one stream."

The witness Albert Beck was the water commissioner on Dempsey Creek in 1936, 1939 and 1940. He also owns a water right out of the creek adjudicated by the 1892 decree in Cause No. 404. He testified:

"Q. Well now for instance in 1938 when there was a supply of water running in Quinlan Slough and as to your own right No. 11 if the Quinlan Slough water had not been diverted into ditches out of Quinlan Slough but had been allowed to flow down the channel of Quinlan Slough to the junction of Dempsey that water would have been available to supply your No. 11 right in 1938 would it not? A. Yes, sir, it would have.

"Q. Or it would have been available to supply any other right in order of priority below the junction of Quinlan Slough and Dempsey Creek? A. Yes, it would."

Plaintiff's immediate predecessor, Herman Johnson, testified:

"Q. This Quinlan Slough was in the Pat Quinlan field, was it? A. It was in his pasture.

"Q. That runs down into Dempsey Creek, doesn't it? A. No. It runs—my ditch runs past the Pat Quinlan house.

"Q. Suppose your ditch were not there at all. The slough water would run along down into Dempsey Creek, wouldn't it? A. Of course, if there wasn't any ditch there it might.

"Q. In case of rainfall, when it was raining hard, the overflow of the slough would run into Dempsey Creek? A. Yes, I guess it would.

"Q. Above the road? A. Yes.

"Q. That is, before the place above the place where the old Yellowstone Trail crossed Dempsey Creek— A. Yes.

"Q. —the slough and the creek came together up there in the bushes? A. Yes.

"Q. There is a channel from the slough down to the creek, isn't there? A. Yes."

Mike Lowry testified that the slough joined Dempsey Creek "below the road or right at the road." Frank Mero testified that, when not diverted therefrom by irrigation ditches, the water flowing naturally down the slough would empty into Dempsey Creek. Claude N. Bielenberg testified the slough joins Dempsey Creek "Right there on the road, Yellowstone Trail there."

Pacific Normandin and Edward Perkins both testified the slough empties into Dempsey Creek.

When William Walker had the ranch he had a ditch which tapped the south bank of Dempsey Creek at a point near the northwest corner of the SE¼ of the NE¼ of Sec. 6, T. 6 N., R. 9 W. which ran thence in an easterly direction through the NE¼ of Sec. 5, T. 6 N., R. 9 W. to his ranch house and buildings located about a quarter of a mile north of the center of said Section 5. This ditch was known as the "house ditch." It was capable of carrying about 50 miner's inches of water. The only other ditch which Walker had was the ditch which he dug in 1872. This ditch tapped the north bank of the slough near the center of Sec. 6, T. 6 N., R. 9 W. and ran thence in a northeasterly direction through Patrick Quinlan's land and Michael Grace's farm to the Walker lands lying to the north of Dempsey Creek. This was all the land which Walker irrigated as he did

no irrigating whatever on his lands lying south of the creek. In the sworn notice of appropriation which he recorded in 1874, Walker swore that by means of the ditch which he constructed to the slough in 1872 he appropriated and conveyed therein *the waters of Dempsey Creek* claiming "a valid right to the use and benefit of 150 inches of *the waters of Dempsey Creek * * * said water is taken out in a ditch from a certain slough* that puts out of said creek; * * * *said slough puts into Dempsey Creek at the County Road,* the said ditch conveying said waters was dug in the spring of 1872 and was through Patrick Quinlan's land and Michael Grace's farm to the farm of the undersigned" William Walker. Thus did the man who dug the original slough ditch state under oath that the purpose of the ditch was to appropriate and convey therein 150 inches of the waters of Dempsey Creek. The notice of appropriation further evidences the fact that the "slough puts into said Dempsey Creek" which is but another way of saying that it feeds or contributes water to Dempsey Creek.

After Herman Johnson acquired the Walker ranch, he dug new and additional ditches leading from both the creek and the slough. One of such ditches, known as "Original No. 6 and No. 7 ditch", tapped the south bank of Dempsey Creek westerly from the county road at a point near the southwest corner of the NW¼ of the SE¼ of section 6, T. 6 N., R. 9 W. conveying water therefrom in an easterly direction to the Walker ranch lands to the south of Dempsey Creek. The ditch was capable of carrying 150 to 200 inches of water and was used jointly by Herman Johnson, Peter Johnson and Patrick Quinlan. Another ditch constructed by Herman Johnson, known as the "No. 11 ditch", tapped the north bank of Dempsey Creek near the southwest corner of the NW¼ of the NW¼ of Sec. 5, T. 6 N., R. 9 W. and extended in a northeasterly direction conveying the waters of Dempsey Creek to the same lands to the north of Dempsey Creek theretofore served and irrigated solely by means of the slough ditch dug by Walker in 1872. Thus, by the time Cause No. 404 was commenced (1891) there were then four ditches for

conducting water to the Walker ranch, viz.: (1) the "house ditch"; (2) the 1872 Walker Slough ditch; (3) Original No. 6 and No. 7 ditch; and (4) No. 11 ditch.

On April 4, 1892, while Cause No. 404 was pending but before it was decided, Herman Johnson commenced digging out and enlarging the old Walker Slough ditch where it crossed the SE¼ of the SE¼ of Section 31, T. 7 N., R. 9 W. owned by Patrick Quinlan. Upon discovering these operations on his lands, Patrick Quinlan came down to where Herman Johnson was digging and said: "What in hell are you doing there?" When informed by Herman Johnson of his intention, Quinlan immediately proceeded to Deer Lodge where, on April 11, 1892, he commenced suit against Herman Johnson to enjoin the threatened operations, reciting in his complaint that Herman Johnson had entered upon Quinlan's land above described and had begun to dig a ditch thereon without leave or permission of Quinlan and against his will, and that Johnson would continue digging thereon unless enjoined.

On April 20, 1892, Herman Johnson filed a duly verified answer in said action wherein he denied "that he is digging or threatening to dig any ditch whatever, but alleges the facts to be, that now and for many years last past the Defendant and his predecessors in interest have owned certain *water rights upon the stream known as Dempsey Creek which passes through the land of Plff. described in his Complaint, and have lawfully owned and used the right of way for at least 150 inches of the waters of said stream across the land of Plaintiff* and have had and maintained a ditch for conveyance of said water across said land—Defts. admits that he has recently been digging and excavating upon said land of Plff. but avers that such digging has not been done for the purpose of constructing a ditch, but only for the purpose of cleaning out the ditch already constructed and owned and controlled by the said Defendant and his predecessors in interest, and to restore the same to its original capacity, as this Deft. has the lawful right to do."

Thus did plaintiff's immediate predecessor in interest, Her-

man Johnson, represent to the court under oath that the ditch running through Patrick Quinlan's land was for the purpose of conveying to the William Walker ranch at least "150 inches of the waters of Dempsey Creek." This is the same appropriation of 150 inches of water which the plaintiff Max Kramer, as a successor in interest of the original appropriation, now represents to the court are diverted by him from an "unnamed stream" which he claims is not a tributary of Dempsey Creek.

After a trial, the district court, in the action by Quinlan against Johnson, found the issues against the defendant Herman Johnson and adjudged that the injunction theretofore issued against him be made perpetual and that he be "perpetually enjoined from, and also his agents, servants and employees, digging, cutting, enlarging or in any manner interfering with or continuing the digging of that certain ditch described in the Complaint." No appeal was ever taken and the order and adjudication became and is final.

In 1900, being eight years after his operations had been stopped by the perpetual injunction against him, Herman Johnson dug another ditch leading south from the place where the old slough ditch crossed the county road a short distance south of the Laundreville house. This new ditch was parallel with and to the west of the county road. At the southerly end of such ditch at a point about 25 rods north of the slough, there was placed a culvert through which the water conveyed by the old slough ditch flowed to still another ditch located to the east of the county road. This last-mentioned ditch was also dug in 1900 and it tapped the north bank of the slough at a point about 8 or 10 feet below, i. e. to the east of the wooden bridge which then spanned the slough at the county road, the intake of the ditch being about 100 feet above the junction of the natural slough channel with Dempsey Creek. From the slough the new 1900 slough ditch ran in a northerly direction parallel with the county road and along the easterly side thereof for a distance of about 25 rods where, through the culvert above mentioned, waters conveyed in the old slough ditch were discharged into

the new 1900 slough ditch where the waters of the two slough ditches were commingled. From such point there was but one ditch for conveying the commingled waters northeasterly through the lands of Peter Johnson to the Walker ranch lands to the north of the creek. The old 1872 slough ditch and the new 1900 slough ditch are each capable of carrying from 150 to 200 miner's inches of water.

150 miner's inches of fresh water running in a stream less than a mile and a half in length must soon be disgorged. The evidence clearly shows that, were it not for the artificial means employed by plaintiff and his predecessors in diverting the water from its natural course, the slough waters would naturally flow into Dempsey Creek to contribute to and augment the flow therein. It is only the plaintiff's interference that prevents the slough from discharging its waters into Dempsey Creek. The plaintiff Kramer testified:

"Q. I want to ask you if at all times that you have known this slough if there has been a sort of stream running through the slough and continuing down with bed and banks and fresh and flowing water and water moving in the central part of the slough; that is, there is a channel there, is there? A. There is a channel and it widens up through there.

"Q. And it goes down to where your ditch or ditches come out? A. Yes, sir.

"Q. And it is your claim and contention that the slough is not a tributary of Dempsey Creek? A. No.

"Q. That is your contention, the stenographer cannot get your nod. A. *It isn't as long as we are using it all the time.*"

The water running in the slough is not developed water in any sense of the term. The plaintiff nevertheless diverts and uses this water, each season long before there is any water available to satisfy his No. 6 decreed right, being his oldest and best right under the 1892 decree. The only other right now owned by plaintiff is his No. 21 right. Respecting these rights, plaintiff testified: "I get 50 inches in No. 6. I have also got 21 but it ain't worth nothing. For many years there was never 21 unless

a flood and by that time the water would be flowing over my meadow.''

The plaintiff also testified: ''Usually the slough was down ahead of the creek and there was water there before the creek because the first right would be handling water above and it took all the water the creek had when the slough was still fresh till there was water enough come down for 6.''

Plaintiff's interference with the natural flow of the waters in the slough on their downward course to Dempsey Creek deprives the lower decreed users of waters to which they are entitled and thereby plaintiff obtains for himself advantages neither permitted by the decree nor sanctioned by law.

In 1911 the wooden bridges spanning the slough and the creek at the county road were replaced by a single concrete bridge. At this time Dempsey Creek was run northerly along the road until it joined the natural channel of the slough to the west of the road at the new concrete bridge. Extending easterly from this junction point to the Deer Lodge River there was but one stream, namely Dempsey Creek. Before this change in 1911 plaintiff's new 1900 slough ditch tapped *the slough* a few feet *above* its old junction with the creek. Since the 1911 change this new slough ditch has tapped the north bank of Dempsey Creek direct and *below* the new junction of the slough with the creek. In other words, since 1911 the new slough ditch has had its head in the creek and not in the slough.

Notwithstanding that he continues to use his ''Original No. 6 and 8 ditch'' from the south bank of the creek, the plaintiff now designates his new 1900 ditch from the north bank of the creek as his ''No. 6 ditch.'' Through this latter ditch plaintiff conducts water to supply his decreed No. 6 right of 50 inches as of 1867 but he testified that ordinarily after about the 10th of July each year there is no water available to supply such right. Of course when there is no water in Dempsey Creek for the No. 6 right, there is no water to supply the rights of any of the downstream users who take their water from Dempsey Creek at points below the county road. Notwithstanding this situation plaintiff

here claims the right to the first, prior and exclusive use of the waters flowing in or discharged from the slough up to 150 inches, without regard to the decreed rights or the needs of the appealing defendants and all other downstream users along Dempsey Creek. While plaintiff considered his No. 11 right of 50 inches as of 1871 "such a late right it wasn't worth bothering with" yet he takes a much different view respecting his later claimed appropriation through the slough of 150 inches as of 1872.

The plaintiff rather frankly admitted that with his diversions from the slough he had more water than he needed and for this reason in 1905 or 1906 he sold his No. 11 right out of Dempsey Creek of 40 inches as of 1871 to Jack Perkins. Respecting this right, the plaintiff testified: "When I first came I irrigated enough—I considered 11 such a late right it wasn't worth bothering with. *I was getting plenty through the slough.*" Again plaintiff testified: "*I had plenty of water. That is why I disposed of No. 11* and there was water enough in the creek I could take 21 if I needed it."

The 1892 decree states *the amount* of the water to which plaintiff is entitled and *the order* in which he may use it. Since the slough is a tributary of Dempsey Creek, the plaintiff violates the injunctive feature of the decree each time that he takes more than his decreed allotment of water and each time that he takes water out of the order specified in the decree when other decreed appropriators downstream have need for such waters.

Not only is there no substantial evidence to sustain the allegation of the complaint and the basic finding of the district court to the effect that "said slough is not now, and never has been, a tributary of said Dempsey Creek" but such allegation and such finding are directly contrary to the evidence and to the physical facts in this case. The testimony of plaintiff's own witnesses, including that given by the plaintiff himself, the map being plaintiff's Exhibit 1, the recorded water right appropriation by William Walker dated March 24, 1874, the duly verified answer of Herman Johnson filed in the Patrick Quinlan suit on

April 20, 1892, all point unerringly to the fact that Quinlan Slough now is and ever has been a tributary of Dempsey Creek.

This case but illustrates that, "One half the work being done in this world is to make things appear what they are not."

"Whoso asserts that he is entitled to the exclusive use of ■ water by reason of its development by him must assure the court by satisfactory proof that he is *not intercepting the supply to which his neighbor is rightly entitled.*" (*Smith* v. *Duff,* 39 Mont. 382, 102 Pac. 984, 986, 133 Am. St. Rep. 587; *Spaulding* v. *Stone,* 46 Mont. 483, 129 Pac. 327.) The waters flowing in the slough are Dempsey Creek waters which have been once used on the lands of prior upstream appropriators and which are returning to Dempsey Creek by means of the natural channel of the slough. These waters so returning are intercepted by plaintiff in their downhill course toward Dempsey Creek at times when they are needed to supply the decreed rights of the downstream users including the appealing defendants. This use of the water plainly violates the decree.

The 1892 decree in the original Dempsey Creek water suit, Cause No. 404, adjudicates the rights and priorities of the various appellants and of the respondent Max Kramer as follows:

| Present Decreed Owner | No. of Right | Date of Priority | No. of miner's inches of water |
|---|---|---|---|
| Frank Mero (Appellant) | 1 | April 1865 | 52½ |
| John E. Perkins (Appellant) | 1 | April 1865 | 12½ |
| Deer Lodge Farms Co. (Appellant) | 2 | 1865 | 174 |
| Deer Lodge Farms Co. (Appellant) | 2 | 1865 | 100 |
| W. E. Cummins (Appellant) | 4 | April 1866 | 51½ |
| John E. Perkins (Appellant) | 4 | April 1866 | 27½ |
| Max Kramer (Respondent) | 6 | 1866 | 50 |
| May Edson Carpenter (Appellant) | 8 | April 1866 | 14½ |
| John E. Perkins (Appellant) | 8 | 1866 | 26 |
| Deer Lodge Farms Co. (Appellant) | 8 | 1867 | 50 |

| Pacific Normandin (Appellant) | 10 | 1869 | 25 |
| John E. Perkins (Appellant) | 11 | 1871 | 40 |
| Marie Normandin (Appellant) | 13 | April 1872 | 95 |
| Deer Lodge Farms Co. (Appellant) | 15 | 1873 | 200 |
| Marie Normandin (Appellant) | 18 | April 1881 | 45 |
| Mary Hempstead (Appellant) | 18 | April 1881 | 45 |
| John E. Perkins (Appellant) | 20 | 1884 | 100 |
| Max Kramer (Respondent) | 21 | 1891 | 110 |

In the instant action the respondent Max Kramer claims prior right to 150 miner's inches of water *by appropriation* as of April 1, 1872 which is the same date as Right No. 13 of the appellant Marie Normandin and which is subsequent to the dates of appropriation fixed in the decree for those appellants holding rights numbered between 1 and 13 under the decree in Cause No. 404.

The respondent Kramer and the numerous appellants herein are each and all entitled to the use of the waters of the tributary only *in the quantity* and *in the order* determined and adjudged in the 1892 decree. To decide otherwise is not only to deprive other decreed users of the water expressly allotted to them by the 1892 decree and to which they are rightly entitled but it is to sanction the taking and use by respondent Kramer of the waters of Dempsey Creek in larger quantities than is allotted to him and to his predecessors by the decree and this without any regard whatever for the order of use prescribed by such decree. The 1892 decree fixes the *quantity* of water and the *order* of its use by the respondent Kramer. Its terms and provisions must be observed.

A court of equity most certainly will not estop the appellants from asserting the respective titles awarded them by the 1892 decree. "The elements requisite for estoppel are substantially those necessary to found an action for deceit, with the exception of the element of knowledge of falsity." (Weil, Water Rights in Western States, sec. 593.) "An estoppel involves turpitude, fraud—such as misleading statements or acts, or concealment of facts by silence—with the result that one party

is induced or led by the words, conduct or silence of another party to do things that he otherwise would not have done. The intent to deceive must have existed, or at least there must have been an imputation that the party against whom an estoppel is claimed expected the other party to act. Unless there is some degree of turpitude, a court of equity will not estop one from asserting his title (or water right in the instant case) where the effect is to forfeit his property and transfer its enjoyment to another.'' (Hutchins, Selected Problems in the Law of Water Rights in the West, p. 402.) No such facts appear in the record before us on this appeal.

It would seem that if respondent has insufficient water to ▮ supply his requirements during the irrigation season his own acts may be responsible therefor, he having long since voluntarily sold and transferred to Jack Perkins his No. 11 right out of Dempsey Creek appropriated in 1871 and having here failed to establish a prior right by his claimed appropriation as of 1872.

It follows that the trial court's findings of fact designated XXI, XXII, XXIX, XXXIII, XXXIV, XXXV, XXXVI, XXXVII, XXXVIII, and XXXIX and conclusions of law designated I and II are erroneous as is the judgment based thereon. The judgment appealed from is reversed and the cause remanded with directions to correct the said erroneous findings of fact and conclusions of law to conform hereto and to render judgment against the plaintiff Max Kramer and in favor of appealing defendants. Appellants are entitled to their costs on this appeal.

MR. JUSTICE ANDERSON concurs.

MR. JUSTICE MORRIS concurring specially:

I concur in the result but not in the volume of extraneous matter that goes to make up the major portion of the opinion.

By express admission the parties to the action, through their respective counsel at the hearing before this court, reduced all controversies to one question, namely: Is Quinlan Slough a tributary of Dempsey Creek? When William Walker's notice of appropriation, made in 1874 and plaintiff's Exhibit 1, the

map showing where Quinlan Slough empties into Dempsey Creek, were introduced in evidence without objection, the fact that the slough is a tributary of the creek was established beyond a reasonable doubt; nothing more was necessary except citation of authorities.

I do not agree with the assertion made relative to the scope of the rule of *res adjudicata* wherein this language is employed: ''A decree of court is *res adjudicata* as to all matters adjudicated therein, *and as to all issues which could have been properly raised irrespective of whether the particular matter was in fact litigated.*'' The portion in italics goes beyond the better reasoned rule and the one generally accepted. (See *Cromwell* v. *Sac County,* 94 U. S. 351, 24 L. Ed. 195; *Davis* v. *Brown,* 94 U. S. 423, 24 L. Ed. 204; *Charles E. Harding Co.* v. *Harding,* 352 Ill. 417, 186 N. E. 152, 88 A. L. R. 563; *Foye* v. *Patch,* 132 Mass. 105; *Swank* v. *St. Paul City Ry. Co.,* 61 Minn. 423, 63 N. W. 1088; 15 R. C. L., Judgments, sec. 469; *United States F. & G. Co.* v. *McCarthy,* 8 Cir., 33 Fed. (2d) 7, 70 A. L. R. 1447, certiorari denied 280 U. S. 590, 50 S. Ct. 38, 74 L. Ed. 639.) It is only issues properly brought within the pleadings in the particular case and determined by the decree that are *res adjudicata* in a subsequent action between the same parties. The question is fairly covered in this jurisdiction by the case of *State ex rel. Sullivan* v. *School District,* 100 Mont. 468, 50 Pac. (2d) 252.

MR. CHIEF JUSTICE JOHNSON:

I dissent. We are not concerned with what might have been adjudicated in 1892, but with what was adjudicated, namely, the water of Dempsey Creek. If Quinlan Slough was then a tributary its water rights held by parties to the suit were adjudicated, whether or not it later ceased to be a tributary. If, on the other hand, Quinlan Slough was not then a tributary its waters were not adjudicated, whether or not it later became one.

Every man's right to his day in court before being deprived of his property is such a fundamental element of any real justice that an adjudication must not be stretched to cover what was not

clearly included within it. The plaintiff's water right was appropriated without question in 1872 and has been used continuously by plaintiff and his predecessors, William Walker and Herman Johnson, from that time to this. It was never questioned before or during the adjudication of 1892 nor until 1935, forty-three years thereafter, and plaintiff then immediately instituted this suit. Obviously, after such long continued use it would have been hopeless for defendants to attempt a present attack upon the validity of plaintiff's water right on the merits. The only hope was to contend that in 1892 the slough was a tributary of the creek and that plaintiff's water right, though used without objection during and for twenty years before and forty-three years after the adjudication, was lost by his predecessor's failure to submit it to adjudication in that suit.

If, as a matter of law, that is actually the situation defendants are of course entitled seasonably to take advantage of it; but under the circumstances, after a silence of nearly half a century since the adjudication, I do not understand how a court of equity can properly entertain the contention. It is the duty of an equity court to deny relief of its own motion whenever it appears that the demand is stale and that the delay is prejudicial or inequitable to the opposing party. (*Crosby* v. *Robbins,* 56 Mont. 179, 182 Pac. 122.) And it is not necessary to plead limitations or laches in order to be entitled to the latter defense. (*Akey* v. *Great Western Building & Loan Ass'n.,* 110 Mont. 528, 104 Pac. (2d) 10; *Lewis* v. *Bowman,* 113 Mont. 68, 121 Pac. (2d) 162.) Even without a pleading of such defense a suit cannot be maintained in a federal equity court of a district nine years after the contract and eight years after demand for performance where the state statute of limitations bars action in five years and where no adequate excuse is offered for the delay. (*Moore* v. *Nickey,* 9 Cir., 133 Fed. 289, 66 C. C. A. 667.) A delay of forty-three years, a third of a century beyond the statute of limitations, cannot be otherwise than prejudicial and inequitable; many witnesses who lived in the vicinity and undoubtedly could have testified concerning the conditions in 1892 have, in all human

probability, died during that time. Here the contention was good in 1892 or not at all, and the delay in raising it was entirely defendants', entirely unexcused and apparently inexcusable. Immediately upon their challenge of his long established right, plaintiff brought action to quiet his title, presumably to utilize such evidence as might still be available after all these years.

''The plaintiff sought the aid of a court in equity and is bound by the principles applicable to proceedings in equity. It is a familiar maxim that equity aids the vigilant, or, as the same thing is expressed in our Civil Code (section 4618) [now section 8756, Rev. Codes 1935], 'the law helps the vigilant, before those who sleep on their own rights.'

''Good faith and reasonable diligence only can call into activity the powers of a court of equity, and, independently of the period fixed by the statute of limitations, stale demands will not be entertained or relief granted to one who has slept upon his rights. Considerations of public policy and the difficulty of doing justice between the parties are sufficient to warrant a court of equity in refusing to institute an investigation where the lapse of time in the assertion of the claim is such as to show inexcusable neglect on the part of the plaintiff, no matter how apparently just his claim may be; * * *.'' (*Kavanaugh* v. *Flavin,* 35 Mont. 133, 88 Pac. 764, 766.)

''Laches, considered as a bar independent of the statute of limitations, is a concept of equity; it means negligence in the assertion of a right; it is the practical application of the maxim, 'Equity aids only the vigilant;' and it exists when there has been unexplained delay of such duration or character as to render the enforcement of the asserted right inequitable.'' (*Riley* v. *Blacker,* 51 Mont. 364, 152 Pac. 758, 759.)

But assuming that the equity court were in a position to consider defendants' claim at all, it should certainly not exert itself very much to sustain the claim; for the very fact of defendants' failure to make any such contention then or during the next forty-three years, during which severe water shortages have

resulted in much litigation, certainly affords very cogent evidence that the slough was then no part of Dempsey Creek.

There can be no doubt that whether one watercourse is a tributary of another is a question of fact. This court has held in *Wills* v. *Morris,* 100 Mont. 504, 50 Pac. (2d) 858, and in *Anderson* v. *Spear-Morgan Livestock Co.,* 107 Mont. 18, 79 Pac. (2d) 667, that where it was only in time of high water or flood that any water from one stream flowed naturally into another and in the absence of high water or flood it did not reach the confluence of the two streams, the trial court was not justified in finding that the first was a tributary of the second.

As I shall point out below, the record comes far from showing by a preponderance of the evidence that Quinlan Slough is even now a tributary of the creek, but assuming for the moment that it does so show, the record also shows that the conditions were far different in 1892. It shows without dispute that the slough originated principally in seepage from irrigation above, that prior to the adjudication of 1892 there was little water there, and that it was the change in the use of irrigation water resulting from that decree which first brought any considerable flow into the slough. Mike Lowery, one of defendants' witnesses, who lived on the Quinlan ranch at the upper end of the slough for thirty-five years, testified that when he went there in 1890 there was not, in his opinion, enough water in the slough to be used for irrigation; that in 1891 it was practically dry around the house, which was near the slough, but that as a result of the change in use after the 1892 decree, the water kept coming closer until he finally had to move out and build another house half a mile away. He said that there were springs in the slough, but that most of the water was "drop" water from irrigation and that after irrigation stopped there was only fourteen to twenty inches of flow in the slough. Certainly an increase of water necessitating such a removal of the dwelling place must have been accompanied by a relatively considerable increase of flow in the channel.

By a finding of fact, to which the defendants have acquiesced

by a failure to object, the trial court found "that there is never to exceed one hundred fifty inches * * * flowing in * * * any part of said slough, during any part of the irrigation season and that there is usually much less than that amount of water flowing in said slough, during all irrigation seasons * * *."

Albert Beck, who was water commissioner in 1938, 1939 and 1940, testified that in the early part of the 1938 season when there was water for everyone the entire flow of the slough dropped to about fifty inches, and in 1939 "to approximately twenty inches, maybe less than that, maybe pretty near dry." He testified at the trial on July 23, 1940, that he thought there was then about twenty-five inches in the slough; this including all the water diverted from it by ditches. Other testimony showed that there was always some water flowing in the slough but not that it flowed from the slough into the creek. On the contrary, the positive testimony is that slough water has never flowed to the creek except in times of high water or flood, or when plaintiff has deposited it there from his slough ditch in order to use the creek as part of his diversion system; that except in times of high water or flood it never ran into the creek until plaintiff's predecessor made a ditch to take it there.

The flow being as little as it still is, and most of it having developed since the 1892 adjudication, it is obvious that even if the slough is a tributary of the creek now it cannot have been one in 1892, and aside from two items, which defendants hardly mention but the majority mainly ground their decision upon, there is absolutely no evidence to the contrary.

These two items contain no element of estoppel or of conclusive evidence. At most they constitute declarations or admissions by plaintiff's predecessors in interest, and they are certainly weakened if not completely nullified by the use subsequently made of the water by plaintiff and his predecessors until 1935 without objection or claim by defendants. But, to give them the full effect argued by the majority, the most they can constitute is some evidence that the slough water was part of the creek in and prior to 1892.

The first is the fact that in the water right location certificate filed by plaintiff's predecessor Walker in 1874, the water is spoken of as "waters of Dempsey Creek * * * taken out in a ditch from a certain slough that *puts out of said creek* on the land now owned by Nicholas Bielenberg purchased by said Bielenberg from the Prouse brothers, said slough *puts into said Dempsey Creek* at the County Road, * * *.''

There are four possible interpretations of the reference to Dempsey Creek. The first is that water in the slough arose principally or entirely from seepage of Dempsey Creek irrigation water. If so, as a matter of law, the water had left the channel of the stream and had by becoming seepage lost its identity as water of the creek. The second interpretation is that it was water of the creek which then came from the creek by the old channel to what in 1890 was the head of the slough. If so, the condition certainly changed long prior to 1892, for the evidence shows without conflict that the slough then arose entirely from seepage in certain land one-quarter to three-quarters of a mile from the creek. The third interpretation is that the water of the slough, if it entered another watercourse at all, would enter Dempsey Creek, which does not mean that the slough was necessarily a tributary of the creek, as held in *Wills* v. *Morris* and *Anderson* v. *Spear-Morgan Livestock Co.*, supra. The fourth interpretation, which is the only one that can help defendants, is that it was intended to indicate that if not diverted from the slough, the water would normally enter the creek;— in other words, that the slough was a tributary of the creek. It is apparent to all the world, as a matter both of law and of fact, that the appropriation was of the water of the slough, which was the watercourse from which it was taken. Under any one of the four possible interpretations, therefore, the reference to Dempsey Creek was just as immaterial and unnecessary to the appropriation as if the reference had been to Deer Lodge River or the Columbia River. Furthermore, the statement constituted a declaration or admission, not of a fact, but merely of a conclusion or opinion of plaintiff's predecessor; it there-

fore does not constitute an admission against plaintiff. (31 C. J. S., Evidence, p. 1025, sec. 272; *Shaver* v. *Canfield,* 21 Cal. App. (2d) 734, 70 Pac. (2d) 507.) Probably that is why defendants choose to rely principally upon the statement that "said slough *puts into* said Dempsey Creek," which the majority opinion states "is but another way of saying that it feeds or contributes water to Dempsey Creek." The latter might possibly have that meaning, rather than the more obvious and less limited meaning that there is a connection or channel by which water might perhaps pass from the slough to the creek if there were enough to flow there. At any rate, the expression "puts into" the creek is certainly analogous in meaning to the expression "puts out" of the creek, which is also used in the location certificate. The only explanation of the latter language is that of defendants' witness, Claude Bielenberg, the son of the Nicholas Bielenberg mentioned in the location certificate as the owner of the land on which the diversion was made. This witness had known the vicinity all his life. He testified that there was a channel "or depression and that leads from Dempsey to the head of the slough," but that he could not say that he had ever seen water in it. All the evidence indicates that ever since anything has been known of the vicinity the slough started or "headed" in seepage far from the creek. Obviously, therefore, the expression "puts out of" the creek is not just another way of saying that the creek contributes water to the slough; and conversely the expression "puts into" the creek is not, as the majority opinion states, just another way of saying that the slough contributes water to the creek. Apparently both expressions relate only to the channel or depression from the slough to the creek at both ends. If, however, they and the reference to the water of the creek mean that the creek directly fed the slough in 1872, the record shows without conflict that it was not true in 1892; on the other hand, if they mean that the slough directly fed the creek in 1872, the other evidence shows without question that it was not true in 1892.

The other item stressed by the majority and mentioned by

the defendants, is the fact that after the trial, but a few days before the decree was entered in 1892, in a suit filed by Quinlan to enjoin plaintiff's predecessor Herman Johnson from enlarging the slough ditch in Quinlan's field, Johnson in his answer again mentioned the water as being water of Dempsey Creek. It was entirely immaterial to the issues of that case where the water came from. Perhaps Johnson merely followed the language of his predecessor's appropriation notice in spite of the fact that it came from the slough, which all the parties must have known so that they were not misled in any way. But in any event, the reference is subject to the same four possible interpretations as in the location certificate, and in either interpretation it was not only clearly untrue, but constituted at most an immaterial conclusion or opinion rather than a statement of fact.

But giving both of these items all the effect contended for, at best they constitute only a declaration or admission which is rebuttable and not conclusive, and obviously not sufficient to put the trial court in error for finding in accordance with the other evidence, aided by an examination of the premises. It seems to me that, even giving those two items the strong evidentiary effect contended for, they cannot be regarded as furnishing such a preponderance of the evidence as is necessary to reverse the trial court's decree and thus destroy a water right of seventy-two years standing.

I think the evidence clearly indicates that originally the slough existed in a slight depression or fold of the surface which sometime, whether entirely temporarily or of more long standing, may have been a high-water channel of the creek and trending toward it at each end; that as a stream of water since the settlement of Montana in the 1860's it either originated entirely by seepage from irrigation water, or contained a negligible volume from springs until irrigation began about April, 1865; that at first it was only a wet or swampy place entirely isolated from the creek in both directions, and that in addition to water lost by seepage or evaporation, it was not of sufficient volume to overcome the high places in the old channel so as to flow nor-

mally to the creek; that it increased in flow until 1872, when Walker made his appropriation, and perhaps thereafter, and that in 1892 it still contained too little water to make it flow normally into the creek as a tributary; that it was only after the adjudication of 1892, and because of the changes in irrigation resulting from that adjudication, that it furnished very much continuous volume of water for irrigation, or could have contributed normally to the creek so as to make it a tributary; that not until 1935 was it even claimed by the defendants or their predecessors to be a tributary of Dempsey Creek.

There is some evidence that it has since 1892 become a tributary, although that evidence is almost entirely inferential or argumentative and certainly does not constitute a preponderance of the evidence. The strongest evidence to that effect is that the plaintiff now diverts the water from the slough at a point only a short distance above the confluence of the two channels; but opposed to that is the accepted court finding noted above that there is never to exceed one hundred fifty inches flowing in any part of the slough during any part of the irrigating season, and that there is usually much less. Certainly there is no force in the argument that one hundred fifty inches must have continued flowing, in spite of seepage and evaporation, sufficiently to reach the creek; for it is only at extreme high water that there is ever such a volume and there is usually much less. There is no contention, of course, that twenty or twenty-five or even fifty inches would normally have reached the creek, especially after the heavy flood run-off has ended and evaporation and seepage are high.

Most of the evidence relied upon to show that the slough has become a tributary, even since 1892, is that the slough and the creek "joined" or "connected" or "came together" or had their "confluence" below the road until they were combined above the road by the county crew about 1910. Numerous witnesses testified to seeing water in the channels, or one of them, at the road, but not one witness testified that water ever flowed normally from the slough to the creek except in high water or flood,

or when placed there by plaintiff's ditch. One example was Ben Goldie, road supervisor in 1906 when the bridges over the two channels were rebuilt. The majority opinion quotes him as saying that ''water was flowing in the streams.'' However his final testimony on that point was that there was water running under the Dempsey Creek bridge but that he was not positive whether water was running under the slough bridge or not.

The only other evidenec is to the effect that unless diverted the water of the slough would run into the creek;—that there was nowhere else for it to go. The latter manifestly means no more than that there is *no other channel* for it to run through, and that it will therefore flow into the creek *if* the seepage and evaporation are little enough and *if* the volume of water is sufficient, and *if* it continues to flow on the surface of the ground as a stream of water. Obviously that alone is insufficient to constitute the slough a tributary of the creek, under the above authorities.

It may be that such evidence, while certainly flimsy, would have been sufficient to sustain a finding, if made, that the slough has since 1892 become a tributary of the creek, but it is certainly not sufficient to reverse the contrary finding, which was actually made and is not presumed to be error; and not by any stretch of the imagination can it be considered sufficient to prove that the slough was a tributary of the creek in or prior to 1892.

In any event, the meaning of the two expressions ''puts out of'' and ''puts into'' and of the witnesses' reference to the joining, connecting, coming together, or confluence of the slough and the creek, and of other testimony relevant to the question whether the slough was or is a tributary, were for the trial judge to determine. It is worthy of note that in making that determination he had the advantage of going upon the ground and making a personal inspection. Obviously he was better situated to understand the testimony of witnesses than are members of this court, and we cannot presume error in that respect. ''A view of the premises made by the trial judge must be presumed as equivalent to an examination by a jury. Whenever a jury

has viewed premises for a better understanding of the testimony of witnesses, the determination of the fact in issue, when supported by some evidence, as here, will not be disturbed on appeal.'' (*Nemitz* v. *Reckards,* 98 Mont. 229, 38 Pac. (2d) 980, 985.)

In *Ryan* v. *Quinlan,* 45 Mont. 521, 124 Pac. 512, the defendants' contentions were surprisingly like those of the defendants here, which are therefore not new. The parties to that suit had been parties to another adjudication of the waters of Dempsey Creek made in 1902. In that suit no reference was made to Blind or Ryan Lake, which was on higher ground two-thirds of a mile from Dempsey Creek, with a small flow of water over its rim, estimated at fifteen to forty inches, which gradually decreased until it entirely disappeared less than half way to the creek; from that point there was no channel to the creek. Not having established a water right in the 1902 adjudication, Ryan conceived the idea of raising the lake level four feet by a dam, conveying the water to Dempsey Creek by ditch and flume, and taking the water from the creek below for the irrigation of his land. Having been adjudged in contempt as in violation of the 1902 decree, Ryan brought action to adjudicate his right, and appealed from adverse findings and decree in which the trial court found that the normal flow of the lake, when not obstructed by Ryan's dam, reached the creek by underground seepage and percolation and became part of the creek.

In the decision, which was written by Mr. Chief Justice Brantly, this court said, with reference to the 1902 adjudication: ''As heretofore stated, the question as to whether the lake is tributary to the creek was not directly involved in the action. The parties were not aware of its existence except by hearsay. Whether, therefore, the plaintiff is estopped by the decree to assert his present claim, depends upon the facts as they actually exist, and not upon a mere construction of it implied by the judgments in the contempt proceedings. * * * If in fact the lake is not tributary to the creek, the existence of the decree does not make it so, * * *. Of course, if the lake is tributary to

the creek, the decree of 1902 concludes plaintiff from asserting a right to appropriate the overflow.

"The contention of plaintiff, therefore, presents the question: Does the evidence sustain the ultimate finding that the lake is tributary to the creek? The burden was necessarily upon the plaintiff to establish his right to intercept and appropriate the natural overflow from the lake, for if this overflow, however small in volume, reaches the creek by reasonably ascertainable channels, it is one of its sources of supply.

"The evidence introduced by plaintiff tended to show that there is a complete disappearance of it at a point 1,500 feet distant from the lake, and that beyond that point there is 'no surface channel, nor any indication upon the surface of an underground way or channel in the direction of the creek. *Prima facie,* therefore, it was thus made to appear that the overflow does not find its way into the creek. The lake being upon the public domain, the plaintiff was * * * *prima facie* entitled to make use of it and to intercept the overflow as he did, provided that in doing so he did not interfere with the use by defendants of the natural flow in the creek. The burden was then cast upon the defendants to show that, if uninterrupted, the flow finds its way into the creek by a defined channel either upon the surface or underground, and that plaintiff's appropriation of it diminishes the volume of water flowing in the creek. This they undertook to establish by showing the character of the debris filling the canyon, and the configuration of the adjacent country. It does not appear, however, from the statement of any witness, that there is any natural surface channel beyond the point of disappearance. While it does appear that the debris in the canyon is perhaps pervious to water, there was not any attempt to show that this is the fact nor that the vegetation on the surface prior to plaintiff's diversion indicated a defined watercourse beneath, nor that there is any sound of running water, nor that there are springs bursting out in the channel below at the mouth of the canyon, nor that the flow of the creek is increased in volume by accession from the lake where it passes

the canyon. Nor was it shown whether the creek is upon bedrock, or whether it runs over an impervious filling of the canyon upon which its bed lies. Neither was it made to appear that the formation of the surrounding elevations is impervious to water so that the overflow from the lake must of necessity seek an outlet through the canyon. Indeed, the evidence introduced by the defendants has not sufficient probative force to present a substantial conflict upon the *prima facie* case made by the plaintiff. It is remarkable for what it fails to show, rather than what it does show. The court was evidently of the opinion that since the direction of the flow, so far as it is visible to the eye, is toward the creek, and since the slopes of the surrounding elevations all converge toward the creek, it was impelled to the conclusion stated in the findings. A moment's reflection, however, is sufficient to satisfy a reasonable mind that the evidence furnishes no substantial ground for the inference. When water seeps into the earth, it mingles with the soil and remains suspended therein, or moves through it either by percolation, thus losing its identity as a flowing stream, or passes away by one or more defined channels.

"It has been settled by a long line of decisions that percolating water is not governed by the same rules that are applied to running streams. * * * The rule, though variously stated, is recognized by the courts both of England and in this country. * * * The result of it is that the proprietor of the soil, where such water is found, has the right to control and use it as he pleases for the purpose of improving his own land, though his use or control may incidentally injure an adjoining proprietor. * * *

"Subsurface water flowing in defined channels reasonably ascertainable is subject to the same rules as water flowing in surface streams; but there is no presumption that any subsurface water, in whatever form it may be found, is tributary to any stream. (Citing cases.) The burden is upon him who asserts this to be a fact. We think that it may be established by circumstantial evidence, * * * but the evidence must have so much of

substance and probative value as will reasonably exclude the contrary hypothesis. This court recognized this rule in *Leonard* v. *Shatzer,* 11 Mont. 422, 28 Pac. 457, and in *Hilger* v. *Sieben,* 38 Mont. 93, 98 Pac. 881. * * * It does not appear that the lake water reaches the creek by any means.''

That case strikingly resembles this, in the defendants' contention that plaintiff was concluded by a decree which did not deal expressly with the water source in question and was not at the time understood as doing so. However, it differs from this in that the attack was directed against a subsequent appropriation and not, as here, against an appropriation made and used twenty years before the decree, and used without objection during the litigation and for forty-three years thereafter. Furthermore, that attack was made immediately after the decree and the subsequent diversion, and not, as here, sixty-three years after the appropriation and forty-three years after the decree. Another difference is that in *Ryan* v. *Quinlan* the defendants' contention was that the lake was tributary to the creek by underground rather than by surface flow.

In the instant case, not only does it not appear positively and without substantial controversy that the slough water has ever reached, or would but for the diversions reach, the creek by any natural means, except in time of high water or flood (which under the above authorities is not sufficient to constitute the slough a tributary), but it affirmatively appears that it was only after the adjudication relied upon to bar plaintiff's right, that the flow in the slough increased to anything like the present amount, and that it was not until forty-three years later that it was even claimed by defendants as part of the creek.

In this state of the law and the record, it is manifest, not only that there is no lack of substantial evidence supporting the basic finding that the slough was not at the adjudication of Cause No. 404 a tributary of the creek, but that the evidence preponderates strongly in favor of that finding. The same is true as to the court's broader finding (which necessarily includes the basic one) that the slough "is not now and never has been,"

a tributary of the creek, which in its broader form is not strictly essential to the decree.

If, nevertheless, the majority of the court find from the preponderance of the evidence that the slough has at some time become a tributary of the creek, they can certainly not find from the preponderance that it clearly became such before the 1892 adjudication. Under those circumstances it seems to me that they can properly do nothing but affirm the decree. Certainly the most they could properly or equitably do would be to remand the cause for further and more satisfactory evidence upon the point, if available, rather than to destroy this water right of seventy-years standing, upon such a record. Certainly, in view of the defendants' failure to object during the continuous use of the slough water right during, and for twenty years before and forty-three years after, the adjudication of 1892, as a matter both of evidence and equity, and in view of all the other evidence, it cannot justifiably be held that the record preponderates toward the conclusion that the slough was a tributary of the creek in 1892, and that plaintiff's predecessor therefore relinquished a water right which he was then and thereafter actively and continuously using. It is a monstrous thing to destroy such a well established property interest upon such a record, and in my opinion the trial court would have committed gross error in deciding the case otherwise than as it did.

Mr. Justice Erickson:

I concur in the dissenting opinion of Mr. Chief Justice Johnson.

Rehearing denied September 21, 1944.